United States Court of Appeals
Fifth Circuit

**F I L E D**

June 15, 2006

Charles R. Fulbruge III
Clerk

In the

United States Court of Appeals

for the Fifth Circuit

_____

Nº 04-50499

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CESAR ARRNOLDO VALDEZ,
HECTOR RAUL VALDEZ,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas

_____

Before SMITH, GARZA, and OWEN,
   Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Hector and Cesar Valdez appeal their convictions and sentences on various drug charges. We affirm the convictions and Hector's sentence. We vacate Cesar's sentence and remand for re-sentencing.

I.

This case involves a drug conspiracy to transport large quantities of marijuana and, on at least two occasions, cocaine from Del Rio, Texas, to Dallas, Texas. Five defendants were charged in an eight-count indictment for their alleged involvement in the operation, but only the appellants, Hector and Cesar Valdez, were convicted following a jury trial.[1]

_____

[1] One co-defendant pleaded guilty and the other
(continued...)

Hector and Cesar were found guilty of conspiracy to possess with intent to distribute 1,000 kilograms or more of marihuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 (Count One). Hector was also found guilty of aiding and abetting possession with intent to distribute more than 50 kilograms of marihuana on or about June 11 to June 13, 2001, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2 (Count Two); he was found not guilty of the two cocaine-related charges against him (Counts Seven and Eight). Cesar was found guilty of aiding and abetting possession with intent to distribute more than 100 kilograms of marihuana on or about October 16, 2001 (Count Four), and on or about December 2, 2001 (Count Five), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2.

The court sentenced Hector to 360 months of imprisonment on Count One (the conspiracy/marihuana charge) and 240 months on Count Two (the aiding and abetting charge), the sentences to run concurrently; 5 years of supervised release; and a $25,000 fine. Cesar was sentenced to 360 months on each of Counts One (conspiracy), Four (aiding and abetting/October 16, 2001) and Five (aiding and abetting/December 2, 2001), the sentences to run concurrently; 5 years of supervised release; and a $25,000 fine.

Hector and Cesar appeal, alleging that the evidence is insufficient to support their convictions and that the district court abused its discretion by denying their motions for severance, made clearly erroneous factual findings with regard to their relevant conduct and alleged leadership roles, and committed reversible

*Booker* error.

## II.

Where, as here, the defendants moved for judgment of acquittal at the close of the evidence, we decide whether the evidence is sufficient by "viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict" and determining whether "a rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992). The jury has the sole responsibility for weighing the evidence and making credibility determinations. *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995). "It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt." *Pruneda-Gonzalez*, 953 F.2d at 193. "However, we must reverse a conviction if the evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged."[2]

## A.

To prove conspiracy to possess and distribute a controlled substance, the government must show beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate narcotics laws; (2) the defendant's knowledge of the agreement; and

---

[1](...continued)
two were acquitted.

[2] *Jaramillo*, 42 F.3d at 923; *see also United States v. Gonzales*, 436 F.3d 560, 571 (5th Cir.), *cert. denied*, 126 S. Ct. 2045 (2006), *and cert. denied*, 2006 U.S. LEXIS 4372 (U.S. June 5, 2006) (No. 05-1324), *and cert. denied*, 2006 U.S. LEXIS 4373 (U.S. June 5, 2006) (No. 05-10509).

2

(3) his voluntary participation in the conspiracy.[3]

Mere presence at a crime scene or association with conspirators is not enough to prove participation in a conspiracy, but the "agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the development and collocation of circumstances."[4] "[A] defendant may be convicted on the uncorroborated testimony of a coconspirator who has accepted a plea bargain unless the coconspirator's testimony is incredible." *United States v. Villegas-Rodriguez*, 171 F.3d 224, 228 (5th Cir. 1999). "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994).

There is ample evidence to support the conspiracy charge against Hector. Although much of the evidence consisted of testimony by three coconspirators—Alfred Garcia, Pedro Ramirez, and Javier Cardenas—who accepted plea bargains and hoped for sentence reductions in exchange for their testimony, their testimony is not incredible, and each coconspirator's testimony tends to corroborate the testimony of the other coconspirators. Moreover, the jurors were adequately informed during direct and cross-examination about the coconspirators'

motivation for testifying, and the jury was free to believe or disbelieve their testimony.

Garcia testified that Hector and Ramirez started transporting marihuana out of Garcia's house in January 2001. Hector and Ramirez would pick up the marihuana from a supplier in Mexico, load it into Hector's truck, and take it back to Garcia's house to break up and repackage in duffle bags. Hector was occasionally involved in breaking down the marihuana and would wear socks on his hands to keep from getting fingerprints on the drugs. Hector's truck would be used to transport the drugs to Dallas, where a man named Rudy would buy them. Hector and Ramirez would pay him when he transported the drugs from Del Rio to Dallas.

Garcia's testimony was corroborated by Ramirez, who testified about the same agreement, which involved picking up the marihuana from the border, repackaging it into duffle bags at Garcia's, and transporting it to Dallas in Hector's truck. According to Ramirez, the money for each load would sometimes be split three ways between Ramirez, Hector, and Garcia, although sometimes Garcia would get paid less. Hector was paid regardless of whether he actually transported the marihuana. Ramirez also stated that Hector came up with the idea of leaving at 5:30 a.m. to avoid the Border Patrol.

Cardenas's testimony further corroborates the existence of the conspiracy and Hector's participation therein. Cardenas testified that Ramirez recruited him to drive a load to Dallas. Ramirez corroborated this testimony. Cardenas further testified that he picked up the marihuana by the river and unloaded it at Garcia's house; Garcia corroborated this testimony. Ramirez drove him to Hector's house to

---

[3] *United States v. Pompa*, 434 F.3d 800, 806 (5th Cir. 2005); *United States v. Sacerio*, 952 F.2d 860, 863 (5th Cir. 1992).

[4] *United States v. Lentz*, 823 F.2d 867, 868 (5th Cir. 1987); *see also United States v. Norman*, 415 F.3d 466, 471 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1087 (2006).

pick up Hector's truck with which to transport the drugs. According to Cardenas, once he got to Hector's place, Hector wanted him to drive Ramirez and Hector around the block so they could talk without the next-door neighbor, a sheriff, overhearing.

Cardenas was arrested on June 13, 2001, before reaching Austin, and he was driving Hector's truck with over 200 pounds of marihuana and over 130 pounds of cocaine. The arresting officer testified about the arrest and stated that an insurance card, bearing Hector's name, was found in the truck.[5] A rational jury could have found Hector guilty of conspiracy beyond a reasonable doubt on the basis of all the evidence.

## B.

As we have explained, the evidence was sufficient to support the finding that a conspiracy to possess with intent to distribute marihuana existed between Hector, Ramirez, and Garcia starting in January 2001. There is similarly ample evidence supporting the finding that

Cesar had knowledge of the conspiracy and voluntarily participated in it sometime between January 2001 and October 2002.

Garcia and Ramirez testified that, after Cardenas was busted with marihuana and cocaine in Hector's truck, Cesar took over Hector's role in the operation. They testified that Cesar would recruit drivers to go pick up the marihuana at a rest area outside of Comstock (which is near Del Rio) and that the marihuana would be loaded onto Cesar's blue Chevy Silverado (although Cesar would not always accompany the drivers). According to Ramirez and Garcia, the marihuana was often taken from Comstock to Cesar's trailer in Austin before it was repacked and moved north to Dallas, although sometimes the loads were taken straight to Dallas.

Garcia testified that Cesar would be paid the same amount that his brother, Hector, had been paid during his involvement. Ramirez stated that, after Cesar took over Hector's role, the same person in Mexico was supplying the marihuana, and the same person in Dallas was buying the loads and paying the same amount as before.

The testimony of Antonio Reyes also corroborated Garcia's and Ramirez's testimony regarding Cesar's knowledge of and participation in the conspiracy. He testified that he saw large quantities of marihuana at Cesar's trailer home and that Cesar kept a large amount of money under his mattress. He also stated that Cesar had recruited him.[6]

---

[5] Testimony by Hector's mistress, Julie Morales, corroborates the existence of the conspiracy and his involvement in it. Julie testified that she met Hector at the Cora Street home (Garcia's house), where she saw Hector and Ramirez unload what looked like bales of hay. When Julie asked Hector what the bales were, he said "skunk weed." Julie was frightened by the large quantity of the drugs, and she called a friend to pick her up. Hector told her not to tell anyone what she had seen, and he "joked" that he would burn her in her car and have her followed if she did. After the incident, Julie said Hector "was always paranoid about who [she] was talking to" and "would pat [her] down to make sure [she] wasn't wired." Finally, she testified that Hector told her he had made $275,000 from the drug business and that he had it stashed away somewhere. (This money was not recovered in a search of Hector's residence.)

[6] Reyes further testified that, on one occasion, Cesar offered him $8,000 to drive to Comstock to pick up marihuana and that Cesar accompanied him on the trip. Reyes testified that he and Garcia (continued...)

4

Reyes testified that he drove to Del Rio on two other occasions for Cesar; on the first, the marihuana was never delivered, and on the second, he was arrested. On December 2, 2001, Reyes, according to his testimony and that of the arresting officer, was arrested transporting 256 pounds of marihuana; he was driving a Chevrolet Blazer that he claimed was provided by Cesar.

Macabee Memmen further corroborated Cesar's involvement in the conspiracy. He testified that Cesar would occasionally store marihuana for brief periods at his apartment. Cesar asked him to pick up a load of marihuana in Comstock, but he declined. Memmen stated that he and his fiance accompanied Cesar to Dallas one time, and they followed Jose Leal, who was driving a load of marihuana in Cesar's Chevrolet Silverado. Based on all the testimony, a rational jury could have concluded that Cesar had knowledge of and voluntarily participated in the conspiracy.

### C.

Defendants complain that the evidence does not support the jury's finding, in response to a special interrogatory, that the amount of marihuana involved in the conspiracy was 1000 kilograms or more (approximately 2200 pounds). This claim is without merit. According to Garcia, Hector was actively involved in the drug transportation operation from January to June

2001, during which time 10 loads were transported, with each load weighing between 500 and 1000 pounds. Garcia testified that he occasionally weighed the loads.

Ramirez similarly testified that 10 loads were transported between January and June of 2001, but he estimated that each load weighed between 400 and 500 pounds. His estimate was based on the amount of money paid for each load, which was between $15,000 and $20,000. At $50 per pound, this would actually yield 300 to 400 pounds per load. Finally, over 200 pounds of marihuana was seized from Hector's truck in June 2001, in addition to approximately 130 pounds of cocaine.

A rational jury could have concluded that based on the quantity of drugs seized, at least 330 pounds of marihuana was transported each time, because when cocaine was not transported, more marihana was transported in its place. Thus, even a conservative estimate based on the testimony and actual seizure would yield at least 3300 pounds of marihuana during Hector's involvement in the conspiracy, which is in excess of 1000 kilograms.

Similarly, Ramirez testified that 10 loads of marijuana were transported after the June 13 bust, when Cesar took over Hector's role and was plainly participating in the conspiracy. Garcia testified that, after the June bust, each load was closer to 100 to 200 kilograms. Moreover, the actual loads seized in October and December 2001 were just over 100 kilograms, yielding a conservative estimate of 1000 kilograms. A rational jury could have concluded that at least 1000 kilograms was transported during Cesar's involvement in the conspiracy.

---

[6](...continued) picked up the marihuana and that Garcia and Cesar were supposed to follow Reyes back to Austin. According to Reyes, however, Cesar had planned to steal that particular load and instructed Antonio to "lose" Garcia and Cesar. Reyes testified that Cesar further instructed him to take the load to an apartment in Austin, where a guy named Macabee Memmen lived; Macabee corroborated this account.

### D.

Defendants complain that the evidence obviously shows that neither Hector nor Cesar was involved in the conspiracy throughout the time alleged in the indictment, or on or about January 1, 2001 until on or about October 14, 2002. "[A]n allegation as to the time of the offense is not an essential element of the offense charged in the indictment," and, within reasonable limits, the offense need only occur before the return of the indictment and within the statute of limitations. *Russell v. United States*, 429 F.2d 237, 238 (5th Cir. 1970) (per curiam). Moreover, the "prosecution, as a consequence of the use of the 'on or about' designation, was not required to prove the exact date; it suffices if a date reasonably near is established." *United States v. Grapp*, 653 F.2d 189, 195 (5th Cir. Unit A Aug. 1981). Therefore, that defendants may not have been involved in the conspiracy throughout its existence does not undermine the jury's decision that during the time that each of them was plainly involved, 1000 kilograms or more of marihuana was transported.

### III.

Defendants challenge the sufficiency of the evidence as to their aiding and abetting convictions. "To prove aiding and abetting of a criminal venture, the government must show that the defendant '(1) associated with the criminal enterprise; (2) participated in the venture; [and] (3) sought by his action to make the venture succeed.'" *Norman*, 415 F.3d at 471 (quoting *United States v. Tenorio*, 360 F.3d 491, 495 (5th Cir.), *cert. denied*, 542 U.S. 930, *and cert. denied*, 542 U.S. 930 (2004)).[7]

_____

[7] To convict of possession of marihuana with intent to distribute, the government must prove (1) possession, (2) knowledge, and (3) intent to distribute. *United States v. Cartwright*, 6 F.3d 294, 299 (5th Cir. 1993). Intent to distribute may be in-
(continued...)

### A.

There was ample evidence supporting a guilty verdict on the count charging Hector's aiding and abetting Javier Cardenas' possession with intent to distribute (Count Two). Javier, driving Hector's truck, was arrested on June 13, 2001, with 210.5 pounds of marihuana. The evidence recounted above could be rationally construed as showing that Hector voluntarily lent his truck to Javier for the purpose that Javier transport the marihuana and that Hector thus voluntarily associated with, participated in, and "sought by his action" of lending the truck to make the distribution venture succeed.

### B.

The evidence was sufficient to support a guilty verdict on the count charging Cesar's aiding and abetting Garcia's possession with intent to distribute (Count Four). On October 16, 2001, Garcia was arrested after the police discovered 236 pounds of marihuana at his house on Cora Lane. The jury could have rationally construed the following testimony as demonstrating that Cesar aided and abetted Garcia's possession with intent to distribute.

First, Reyes's testimony about the load he ran for Cesar in December 2001 supports a rational inference that Cesar was still involved in the conspiracy in October 2001, at the time of the seizure. Moreover, Garcia testified that, although his house was not generally utilized for the transportation scheme following the June 13 bust, it was being used on this particular occasion. He explained that the Comstock location that they had been using became suspicious after Reyes "lost" a load he had

_____

[7](...continued)
ferred from the large quantity of drugs involved. *Id.*

6

picked up there (the load that Cesar actually stole) and that they had to go back to using his trailer. Garcia's testimony supports a rational inference that the load seized from his house on October 16, 2001, was part of the conspiracy in which Cesar took part.

Therefore, the jury could have rationally inferred that the load seized from Garcia's house was part of the criminal venture of which Cesar was a participant and that Cesar sought to make the venture succeed by aiding with the distribution of the marihuana: by lending his truck for the marijuana to be transported, by recruiting drivers for the distribution, and/or by allowing the marihuana to be stored at his house in Austin. That is, the jury could have rationally inferred that the load found at Garcia's house was meant to be transported (from the quantity of the drugs seized and the circumstances of the conspiracy) and that Cesar facilitated the transportation/distribution part of the venture. As we have noted repeatedly, the type of evidence that supports a conspiracy conviction typically supports an aiding and abetting conviction. *United States v. Casilla*, 20 F.3d 600, 603 (5th Cir. 1994).

### C.

Count Five involved the arrest of Antonio Reyes on December 2, 2001; the evidence previously recounted emphatically supports a conviction on this aiding and abetting count. Reyes testified that he was picking up a load for Cesar, in a vehicle Cesar had provided, when he was arrested with 256 pounds of marihuana. Reyes's testimony supports a rational inference that this load was a part of the same criminal venture and that Cesar sought to make the venture succeed by providing a vehicle with which to transport the marihuana.

### IV.

Defendants' argument that the district court erred in denying the motion for severance is without merit. We review a denial of severance for abuse of discretion. *United States v. Ramirezza*, 78 F.3d 179, 184 (5th Cir. 1996). Rule 8(b) of the Federal Rules of Criminal Procedure allows for joinder of defendants in a single indictment "if they are alleged to have participated . . . in the same series of acts or transactions constituting an offense or offenses." As a general rule, "persons indicted together should be tried together, especially in conspiracy cases." *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993). Federal Rule of Criminal Procedure 14 allows, however, severance of properly joined defendants on a showing of prejudice to a defendant or the government.

To show that the denial of severance was an abuse of discretion, the defendant must demonstrate that "(1) the joint trial prejudiced him to such an extent that the district court could not provide adequate protection; and (2) the prejudice outweighed the government's interest in economy of judicial administration." *United States v. Richards*, 204 F.3d 177, 193 (5th Cir. 2000) (internal quotations and citations omitted).

Neither Hector nor Cesar has shown prejudice. They argue that the trial was complex and that the acquittal of two of the codefendants, based on largely the same evidence presented against Hector and Cesar, shows that the jury was confused by the evidence.[8] First,

---

[8] Hector's motion was not timely under Federal Rule of Criminal Procedure 12 because he did not make it pre-trial. The district court still considered the motion, though, along with Cesar's timely (continued...)

a "general description of the complexity of a trial is not sufficient to show the 'specific and compelling prejudice' necessary for reversal of the denial of a motion to sever." *Id.* Moreover, a review of the trial transcripts reveals that the bulk of the testimony related to Hector's and Cesar's participation and leadership roles in the conspiracy, so it is unlikely that the jury could have been confused about the two brothers' identities or actions. If anything, the fact that the jury acquitted two of the codefendants and found Hector not guilty on the two cocaine charges shows that it was able to parse the evidence and consider it separately for each defendant and each count.[9]

Finally, the district court gave the jury a cautionary instruction to consider the evidence against each defendant separately.[10] Defendants' severance argument is completely without merit.

## V.

Although the appellants frame their third issue as alleged *Booker* error,[11] they seem to be complaining, at least in part, that the district

court's leadership adjustment and relevant conduct determination—specifically the estimation of the amount of marihuana involved and the inclusion of cocaine—was unsupported by the evidence.[12] This court reviews a district court's factual findings for clear error.[13] We "will deem the district court's factual findings clearly erroneous only if, based on the entire evidence, [the court is] left with the definite and firm conviction that a mistake has been committed." *Cabrera*, 288 F.3d at 168 (internal citations and quotations omitted).

"A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole." *Villanueva*, 408 F.3d at 203 n.9. A district court "may adopt the facts contained in a [presentence report ("PSR")] without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable." *Cabrera*, 288 F.3d at 173–74. "The defendant bears the burden of showing that the information in the PSR relied on by the district court is materially untrue." *United States v. Valencia*, 44 F.3d

---

[8](...continued) motion.

[9] *United States v. Ellender*, 947 F.2d 748, 755 (5th Cir. 1991) ("[A]cquittals as to some defendants on some counts support an inference that the jury sorted through the evidence and considered each defendant and each count separately.").

[10] *United States v. Hogan*, 763 F.2d 697, 705 (5th Cir. 1985) ("Appropriate cautionary instructions can decrease the possibility that the jury will improperly transfer proof of guilt from one defendant to another.").

[11] *See United States v. Booker*, 543 U.S. 220 (2005).

[12] *See* Appellants' Brief at 46–48 ("Hector and Cesar submit that there was not even a preponderance of the evidence to add the cocaine amounts to their sentences since the jury acquitted Hector on all counts regarding cocaine, and Cesar was never charged with any cocaine . . . . Moreover, there was not ever a preponderance of the evidence that Hector or Cesar Valdez were leaders in the conspiracy.").

[13] *United States v. Cabrera*, 288 F.3d 163, 168 (5th Cir. 2002); *see also United States v. Villanueva*, 408 F.3d 193, 203 n.9 (5th Cir.) ("Post-*Booker*, we continue to apply the same standard of review to claims of erroneous fact-finding . . . ."), *cert. denied*, 126 S. Ct. 268 (2005).

269, 274 (5th Cir. 1995).

### A.

Hector and Cesar argue that the evidence does not support the four-level adjustment for their alleged leadership roles in the organization. Section 3B1.1(a) of the United States Sentencing Guidelines authorizes this adjustment if the "defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." In making the leadership determination, the court should consider such factors as the "exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4 (2003). "The district court may find that a defendant exercised a leader/organizer role by inference from the available facts." *Cabrera*, 288 F.3d at 174.

The district court, after reviewing the trial transcripts, adopted the factual findings in the PSR, which indicated that Hector received a greater amount of the profits, made technical decisions about concealing the drugs, and planned the route to be taken by the drivers. Although Hector objected at the sentencing hearing that the trial evidence supports, at most, a three-level adjustment for his role as a manager, Ramirez's and Garcia's testimony discussed above provides an adequate evidentiary basis for the PSR's findings.[14]

Based on this evidence, the district court could have inferred that Hector exercised decision-making authority and participated in organizing the offense to such a degree that he was a leader rather than a manager. The fact that Ramirez was also probably a leader (because he also received a larger share of the profits, he recruited Hector, and he dealt with the Mexican suppliers) does not undermine the finding that Hector was a leader: A conspiracy can have more than one leader. *Morphew v. United States*, 909 F.2d 1143 (8th Cir. 1990).[15]

### B.

In making the leadership determination as to Cesar, the court adopted the factual findings in the PSR, which stated that Cesar "made arrangements with the buyers in the United

_____

[14] Specifically, Ramirez testified that he, Hector, and Garcia would sometimes split the money for each load three ways but that Garcia would get paid (continued...)

[14](...continued) less when he was just storing the marihuana at his house instead of transporting it to Dallas. Ramirez testified that, unlike Garcia, Hector would get paid the same regardless of whether he accompanied the drivers when they transported drugs to Dallas.

Moreover, Garcia testified that "we" (seemingly including Hector) would conceal the drugs in Hector's truck under a board, brown paper, fences, and pipes to make it look like a farm truck, from which the court could have rationally inferred that Hector was involved in the decision-making of how drugs would be concealed in his truck. Furthermore, Ramirez and Garcia testified that Hector devised the plan for the drivers to leave at 5:30 a.m. by a particular route so as to minimize the chance of being stopped by the Border Patrol.

[15] *See also United States v. Yeager*, 331 F.3d 1216 (11th Cir. 2003) (holding that offense level of each participant in conspiracy of *two* persons could be enhanced for a leadership role if both exercised authority and control over distinct portion of criminal activity).

States," "organize[d] the transportation of drugs to Austin," and hired drivers. Although Cesar objected that, at most, he introduced some drivers to Ramirez and Garcia, the testimony at trial provides an adequate evidentiary basis for the facts alleged in the PSR.[16] Based on all the evidence, the court did not clearly err by adopting the findings in the PSR that Cesar was a leader, so a four-level adjustment was appropriate.

C.

Defendants complain of the district court's inclusion of cocaine in their relevant conduct determinations. Specifically, adopting the findings in the PSR, the court attributed 80 kilograms of cocaine to both Hector and Cesar. The guidelines assign a base offense level of 36 for quantities of marihuana between 10,000 and 30,000 kilograms, *id.* § 2D1.1(2); with the four-level leadership adjustment, each defendant had an offense level of 40, for which the guidelines authorize a sentence of 292 to 365 months.[17]

Without the inclusion of cocaine, Hector was attributed with 2,370 kilograms of marihuana, which would yield a base offense level of 32. *Id.* § 2D1.1(4) (assigning an offense level of 32 for at least 1000 but less than 3000 kilograms of marihuana). With the four-level leadership adjustment, the offense level is 36, for which the guidelines authorize a sentence of 188 to 235 months. Cesar, who was attributed with 3509 kilograms of marihuana, would have a base offense level of 34 and a total offense level, with the leadership adjustment, of 38, for which the guidelines authorize a sentence of 235 to 293 months. Each defendant was sentenced to 360 months, which would have been well outside the guideline range, had the district court excluded the cocaine from the relevant conduct determination.

Hector's argument that the cocaine cannot be included in his relevant conduct because the jury acquitted him of the cocaine charges is meritless. "A jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a

---

[16] Ramirez and Garcia testified that, after Hector withdrew from the organization, Cesar took over his brother's role and share of the profits and began to recruit drivers for the operation. There was also evidence that Cesar made arrangements to pay the drivers he recruited. Antonio Reyes testified that Cesar recruited him to drive a few loads and offered to pay him $8,000 for one of the loads. Memmen similarly testified that Cesar recruited him to store loads at his apartment on occasion and attempted to recruit him to pick up a load from Comstock; Cesar would pay Macabee with marihuana for personal use.

Furthermore, according to Reyes, Cesar organized the theft of one load from the suppliers in Mexico; Italo White testified that Cesar recruited him to falsify a document for this endeavor to show that the load had been seized by police. Moreover, Cesar provided his truck for transporting loads of marihuana, and the loads would often be repackaged at his home in Austin before being transported north. Cesar would also occasionally follow the drivers when they transported the drugs to Dallas.

[17] Under the guidelines, the cocaine is converted into an equivalent quantity of marihuana: One gram of cocaine is equivalent to 200 grams of marihuana; thus, 80 kilograms of cocaine is equivalent to 16,000 kilograms of marihuana. U.S.S.G. § 2D1.1 cmt. n.10.

preponderance of the evidence."[18] There was easily a preponderance of the evidence to support the inclusion of cocaine in the relevant conduct determination for Hector. Notably, when Javier Cardenas was busted on June 13, 2001 driving Hector's vehicle, the police seized 60 kilograms of cocaine along with the marihuana. Moreover, Ramirez testified that he and Hector ran a 20-kilogram load of cocaine before the June 13 bust.

### D.

The inclusion of cocaine in Cesar's relevant conduct is more problematic. Although the government's failure to charge Cesar with a cocaine offense does not prevent the district court from including cocaine in his relevant conduct, the finding must still be supported by a preponderance of the evidence.[19]

According to the evidence produced at trial, cocaine was only transported on June 13, 2001 and once before that. If Cesar did not join the conspiracy until after the June 13 bust, the district court could not attribute the cocaine quantities to him.[20] The court concluded, however, that Cesar entered the conspiracy from its inception and that the cocaine could be attributed to him.

The testimony was somewhat ambiguous as to whether Cesar was involved in the conspiracy from its inception. We do not decide that question for the purpose of this issue, because even if the court did not clearly err by finding that Cesar joined the conspiracy at its inception, the sentencing guidelines would allow the district court to include the cocaine in Cesar's relevant conduct only if it was a "reasonably foreseeable act[] . . . of others in furtherance of the jointly undertaken criminal activity."[21]

Cocaine was transported twice during the conspiracy. Ramirez stated that he and Hector "did a load" of cocaine, weighing 20 kilograms, before the June 13 bust. Sixty kilograms of cocaine was seized in the bust, but it was concealed in the bale of marihuana and was not discovered until the crime lab cut the bale open. The remainder of the testimony regarding the drug conspiracy describes it as a marihuana transportation scheme. Although the government attempts to describe the conspiracy as a "drug transportation" conspiracy, which would make the cocaine foreseeable, this begs the question of foreseeability, transforming the inquiry into the nearly identical inquiry of whether this was a marihuana trans-

---

[18] *United States v. Cathey*, 259 F.3d 365, 368 (5th Cir. 2001) (quoting *United States v. Watts*, 519 U.S. 148, 157 (1997)).

[19] *United States v. Partida*, 385 F.3d 546, 566 (5th Cir. 2004) ("Due to a standard of proof at sentencing lower than the proof necessary to convict at trial, the scope of a sentencing court's fact finding is not limited to considering only the conduct of which the defendant was formally charged or convicted."), *cert. denied*, 544 U.S. 911 (2005).

[20] U.S.S.G. § 1B1.3 cmt. n.2 ("A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows
(continued...)

---

[20](...continued)
of that conduct.").

[21] U.S.S.G. § 1B1.3(a)(1)(B). Although the "reasonably foreseeable" requirement does not apply to conduct in which the defendant was personally involved or which the defendant aided and abetted, the trial testimony does not support an inference that Cesar was personally involved in, or aided and abetted, the two cocaine distributions at issue.

11

portation conspiracy or a drug transportation conspiracy.

Arguably, these two loads of cocaine, at least one of which was hidden inside a bale of marihuana, would not be reasonably foreseeable to a member of the conspiracy who, according to the trial testimony, dealt only with marihuana. That is, there is no evidence that Cesar had a "leadership" role in the conspiracy before June 13, so there is no indication that he had knowledge of everything that was transported. Given the isolated and secretive nature of the two cocaine transports, the cocaine could be reasonably foreseeable to Cesar only if his mere involvement in the conspiracy automatically makes the transportation of any drugs reasonably foreseeable to him. But "the reasonable foreseeability of all drug sales does not automatically follow from membership in the conspiracy." *United States v. Wilson*, 116 F.3d 1066, 1077 (5th Cir.), *vacated in part on other grounds sub nom. United States v. Brown*, 123 F.3d 213 (5th Cir. 1997) (en banc). Because the evidence does not support an inference that the cocaine was reasonably foreseeable to Cesar, we vacate his sentence and remand for resentencing.

## E.

Defendants contest the adoption of the PSR's findings with respect to the total quantity of marihuana attributable to them. The marihuana calculation only affects Cesar, however.[22] The PSR states that he was responsible

for 3509 kilograms of marihuana.[23] This amount is unquestionably supported by the evidence, with two exceptions that reduce the quantity found by about 23 kilograms, so it would not affect the base offense level.[24]

The evidence also supports the estimation following the June 13, 2001, bust (*i.e.* eight loads at 100 kilograms). Trial testimony indicated that ten loads, weighing 100 to 200 kilograms each, were transported following the bust, and this estimate seemed to include the two loads actually seized in October and the one load seized in December. Because the PSR's count would yield eleven loads (eight plus three), it appears that one load was double counted. But, the discrepancy from the double counting of a load (at most 111.7 kilograms) would not affect the base offense level, because the total marihuana would still exceed

---

[22] Because of the amount of cocaine found in Hector's car during the June 13, 2001, bust (60 kilograms), Hector will have a base offense level of 36 regardless of the amount of marihuana attributed to him.

[23] The PSR calculates the total based on the following estimates: (1) Between January and June 2001, 2275 kilograms of marihuana was stored at Garcia's house; (2) on June 13, 2001, 95 kilograms of marihuana was seized from Javier Cardenas's truck; (3) between June 14, 2001, and December 2001, eight loads of marihuana weighing 100 kilograms each (800 kilograms) were transported; (4) on October 4, 2001, 109 kilograms of marihuana was seized from a vehicle containing Ramirez's belongings; (5) on October 16, 2001, 107 kilograms of marihuana was seized from Garcia's home; (6) on December 2, 2001, Reyes was arrested with 111.7 kilograms; and (7) on October 14, 2002, 17.9 kilograms was seized from Michelle Diaz and Vanessa Ruiz.

[24] First, the quantity reported for the seizure on December 2, 2001, from Reyes's vehicle (111.7 kilograms), is lighter than the amount to which the witnesses testified, which was closer to 116 kilograms. Second, the government presented no evidence regarding a transaction on October 2002 (17.9 kilograms).

3000 kilograms.[25] Moreover, the estimate adopted by the district court as to the quantity transported after the June bust was actually lighter than that supported by the evidence (because each load after the bust was reported to weigh as much as 200 kilograms).

With respect to the quantity of marihuana transported from January to June 2001, the finding that Cesar joined the conspiracy since its inception is not clearly erroneous.[26] There

---

[25] U.S.S.G. § 2D1.1(3) (assigning a base offense level of 34 for at least 3,000, but less than 10,000, kilograms of marihuana).

[26] Garcia testified that, after the June 13 bust, "[w]e then approached Hector's brother Cesar, and we asked him if he wanted to start, you know, if we could start using his truck and we would just pay him what we were paying his brother." This testimony could be interpreted as suggesting that Cesar was not previously involved in the conspiracy. Ramirez's testimony is likewise uncertain as to Cesar's involvement in the conspiracy before the June 13 bust. Ramirez testified that, after the bust, Cesar "took over" his brother's role. When the prosecutor asked Ramirez whether Cesar was involved in the conspiracy before June 13, Ramirez responded that Cesar "was getting his own thing, too . . . . He was just getting loads of marihuana, too."

When the prosecutor asked Ramirez whether he delivered any loads to Cesar before the June 13 bust, he testified that "we dropped about 20 pounds, 15 pounds" on the way to Dallas. Although the testimony is less than pellucid, the district court, hearing the evidence firsthand, could have rationally interpreted this testimony to mean that Cesar was involved in a more minimal role before June 13 but became a leader after that. Specifically, the testimony could mean that Cesar was receiving loads of marihuana on occasion from the other conspirators before the bust but did not begin recruiting drivers

(continued...)

fore, the marihuana transported during that period is attributable to Cesar, who also challenges the reliability of the estimate for this time frame because of the inconsistency among the witnesses' estimations, and between those estimations and the marihuana actually seized.[27]

Thus, the question is whether the PSR's estimation that 2275 kilograms was transported from January to June 2001 has an adequate evidentiary basis with sufficient indicia of reliability. *United States v. Alford*, 142 F.3d 825, 832 (5th Cir. 1998). A "district court may consider 'estimates of the quantity of drugs for sentencing purposes.'" *Id.* The court may extrapolate the quantity from "any information that has 'sufficient indicia of reliability to support its probable accuracy,' including a probation officer's testimony, a policeman's approximation of unrecovered drugs, and even hearsay." *Id.* (quoting *United States v. Huskey*, 137 F.3d 283, 291 (5th Cir. 1998) (citing U.S.S.G. § 6A1.3 cmt.)).

Although the witnesses' estimations of the quantity of marihuana per load are somewhat

---

[26](...continued)
and participating in the organization of the scheme until after the bust.

[27] Ramirez testified that, between January and June 2001, ten loads of marihuana were transported, each between 400 and 500 pounds (roughly 180 to 227 kilograms). Garcia testified that each of the ten loads was between 500 and 1000 pounds (roughly 227 to 450 kilograms). The load seized on June 13, 2001, contained a much lower quantity of marihuana—210 pounds (roughly 95 kilograms), but it also contained 132 pounds of cocaine (roughly 60 kilograms) concealed within the marihuana; so the total weight of the seizure was 342 pounds (or 155 kilograms).

inconsistent and are not supported by the amount of drugs seized, the information in the PSR bore a sufficient indicia of reliability for the district court to rely on it. The PSR's estimate of 2275 kilograms seems to be based on ten loads of marihuana at roughly 227 kilograms a load (or 500 pounds), which would be consistent with Ramirez's and Garcia's testimony (at the high end of Ramirez's and the low end of Garcia's estimates).

## VI.

Defendants contend the district court committed reversible *Booker* error. They concede that neither of them made a constitution-based objection at sentencing, and a review of the record further reveals that they objected solely to the factual findings in the PSR and not to the fact that the court was making factual findings. Thus, we review for plain error. *United States v. Mares*, 402 F.3d 511, 520 (5th Cir.), *cert. denied*, 126 S. Ct. 43 (2005).

"An appellate court may not correct an error the defendant failed to raise in the district court unless there is '(1) error, (2) that is plain, and (3) that affects substantial rights.'" *Id.* (quoting *United States v. Cotton*, 535 U.S. 625, 631 (2002)). If these conditions are met, the "court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* Because these sentences were enhanced based on judge-found facts that were not admitted by the defendants or found by the jury, there is error that is plain. *Id.* at 521.

As in *Mares*, however, there is no showing that the error affected substantial rights. Defendants have the burden of showing that the district judge, "sentencing under an advisory scheme rather than a mandatory one, would have reached a significantly different result," *id.*, and they have not met this burden. The court made no affirmative statements at sentencing that indicate that it would have reached a significantly different result under an advisory scheme.

In fact, the court commented, after defendants' pleas for mercy, that "I hear you both asking for mercy because basically this is the rest of your life in prison . . . . [N]obody has asked mercy for those people that got hooked on the drugs that you were moving so that you could make a living, so that you could live in a nice house and you could drive a nice car. What about those folks? Anybody want to ask mercy for them?" In these circumstances, defendants have not met the standard set forth in *Mares*. Although they urge us to discard *Mares* and use the plain error standard for *Booker* error adopted by other circuits, this panel is bound by *Mares*.

The judgments of conviction are AFFIRMED. The sentence of Hector Valdez is AFFIRMED. The sentence of Cesar Valdez is VACATED and REMANDED for resentencing.

14