# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 3, 2025
Lyle W. Cayce
Clerk

_____

No. 24-40100
_____

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ROSA MIRIAM VENTURA,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 6:20-CR-37-1

_____

Before DENNIS, HAYNES, and RAMIREZ, *Circuit Judges*.

PER CURIAM:[*]

Defendant Rosa Miriam Ventura appeals her conviction for conspiracy to transport foreign nationals in violation of 8 U.S.C. § 1324. She raises several issues for our consideration, arguing that each is sufficient for a reversal. After careful review of the record, we AFFIRM the conviction.

_____

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 24-40100

## I.    Background

Although we deal with Ventura's appeal only, the jury heard facts spanning nearly six years regarding multiple defendants.  We briefly recap them below.

### A. Factual History

In October 2019, a police officer stopped a car in Victoria County, Texas.[1]  The officer discovered three people in the car: Deon Bishop ("Deon") was driving the car, Xiomara Martinez ("Xiomara") was in the passenger seat, and Hector Fuentes ("Hector") was in the back seat. Suspecting that Hector was in the country illegally, the officer contacted Border Patrol.  Upon Border Patrol's instruction, the officer detained all three individuals.

During trial, Xiomara testified that Hector was not the first alien she had given a ride to; she began transporting people back in 2015.  It started after she met a man named Freddy Morales ("Freddy"), who became aware of Xiomara's financial difficulties.  He offered her cash to meet a stranger and drive her from the border to Houston, Texas. Xiomara accepted; the stranger hid in Xiomara's trunk as she drove her past immigration checkpoints. Xiomara then took the stranger to meet Freddy, who handed Xiomara $3,000.

Freddy eventually introduced Xiomara to his mother, Sonia Morales-Perez ("Sonia"), and Ventura, two people who would have substantial involvement in Xiomara's subsequent transportation tasks.[2]  Xiomara began

_____

[1] The officer testified that he pulled the car over because it was traveling in the left lane but not passing.

[2] Multiple people testified that Ventura provided aliases: sometimes she went by "Santos"; sometimes she went by "Miriam."  However, those witnesses provided an in-

communicating with them, along with Freddy, about assignments. On several occasions, she passed off whatever stranger she had picked up to Ventura, who would then pay her cash. She would also stop at Sonia's house before her trips, and Sonia would pray over the journey. Xiomara testified that it was Ventura who had asked her to pick up Hector, Sonia's nephew, and that Deon was a friend who agreed to accompany her. Moreover, both Ventura and Sonia would direct Xiomara on how to handle herself should she be caught: deny knowing anything about the individual and feign ignorance as to how they got inside her trunk.

Xiomara was not the only person who testified about Ventura and Sonia's smuggling operation. For example, Abraham Morales-Sanchez, Freddy's stepbrother, testified that he planned with Sonia to come back to the United States after he was deported in 2015. Sonia and Ventura picked him up, handed him Freddy's identification, and accompanied him as he went through an immigration checkpoint. He paid the two women for their help. Similarly, Morales-Sanchez's sister-in-law testified that Sonia and Ventura picked her up after she climbed through a hole under a fence along the Mexico-Texas border. Both Morales-Sanchez and his sister-in-law testified to stopping at Sonia's house along their journey, where Sonia would pray over them. While there, they encountered multiple other individuals from a variety of countries.[3] In total, the government had seven individuals testify as to their personal involvement with Ventura's trafficking activities.

---

court identification of Ventura and confirmed that she was the individual with whom they dealt. Thus, for consistency's sake, we refer to her as "Ventura" throughout this opinion.

[3] The jury heard from Morales-Sanchez's sister-in-law that she witnessed a random girl stay at Sonia's house for a week because the girl was unable to pay. She "heard" that Ventura eventually took the young girl to a "warehouse." This government later attempted to corroborate this testimony through a police officer, Joe Villarreal, who investigated Sonia's home. Although Ventura challenges the portion of Officer Villarreal's

No. 24-40100

Finally, the jury heard evidence from several police officers. Some of this testimony included an account from 2016, when a police officer pulled Ventura over because she was driving too slowly. The officer noticed that Ventura had a miniature statue of Jesus Malverde, a saint associated with smugglers, in her car. He also discovered that the man in her back seat was from El Salvador and contacted Border Patrol. Another instance happened in 2014: Jose Escobedo-Garcia, Ventura's husband, was similarly pulled over while driving a Mexican woman in his backseat. The woman and Escobedo-Garcia gave inconsistent stories to the police as to how they knew each other, resulting in the officer referring the two to Border Patrol and seizing Escobedo-Garcia's car. The officers eventually released the vehicle after inspecting it. As the registered owner of the car, Ventura signed the release papers.

## B. Procedural History

In February 2020, a grand jury indicted Ventura for knowingly and intentionally conspiring to transport illegal aliens within the United States. The indictment named three other defendants: Sonia, Deon, and Xiomara. Sonia died of COVID-19-related complications, while Deon and Xiomara pleaded guilty to the offense.

Originally, Ventura also pleaded guilty. However, she subsequently withdrew her plea and changed it to not guilty. Thereafter, the government filed—and a grand jury returned—a superseding indictment. This superseding indictment identified the length of the conspiracy from July 2013 to October 2019. It also indicted two other individuals: Escobedo-Garcia and Freddy.

_____

testimony on this subject, she does not challenge the testimony from Morales-Sanchez's sister-in-law.

4

No. 24-40100

All three defendants were tried together, and all three were found guilty of conspiracy to transport illegal aliens. At the sentencing hearing, the district court judge sentenced Ventura to 120 months' imprisonment, the statutory maximum.

## II.    Discussion

Ventura contests her conviction on several grounds. We ultimately hold that none undermines the jury's verdict.

### A.  Admission of the Challenged Evidence

The district court let in evidence that Ventura argues should never have been presented to a jury: (1) phone call recordings between Sonia and Hector after Hector got arrested; and (2) the testimony of Deputy Joe Villarreal.[4] We hold that the district court did not err by admitting that evidence.

### (1) Phone Call

While detained, Hector placed two phone calls to Sonia. She advised Hector to inform the cops that he was merely receiving a ride from Xiomara

---

[4] Ventura also challenges the admissibility of "uncorroborated" coconspirator testimony. But this challenge goes nowhere. The government brought forth several witnesses who claimed to be part of the conspiracy or objects of the conspiracy—including Xiomara, Deon, Hector, and Morales-Sanchez, among others. "[E]ach coconspirator's testimony tends to corroborate the testimony of the other coconspirators." *United States v. Valdez*, 453 F.3d 252, 257 (5th Cir. 2006). Further, this circuit has long held that a defendant may be convicted on the testimony of a coconspirator who has accepted a plea bargain—even if that testimony is uncorroborated—so long as the testimony is not "incredible." *United States v. Valdez*, 453 F.3d 252, 257 (5th Cir. 2006). While a lack of credibility might cast doubt on the reliability of each witness's testimony with the jury, it does not render testimony incredible as a matter of law. *See United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994) ("Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature.").

and Deon after they were hanging out. She further made clear that Hector should deny being from Honduras. Recordings and transcripts of these calls were provided to the jury.

Ventura says that the district court judge erred because the recordings were never properly authenticated, they contain hearsay statements, and their admission violated the Confrontation Clause. We review the constitutional challenge de novo, *United States v. Noria*, 945 F.3d 847, 853 (5th Cir. 2019), and the evidentiary rulings for abuse of discretion, subject to harmless error, *United States v. Sanjar*, 876 F.3d 725, 738 (5th Cir. 2017).

None hold water. Recordings are admissible if a judge undertakes an independent examination and believes them to "accurately reproduce[] the auditory experience." *United States v. Buchanan*, 70 F.3d 818, 827 (5th Cir. 1995) (quotation omitted). The government had Sonia's stepdaughter identify the female voice on the recording as Sonia's, and had a custodian of records for the county sheriff's office testify that the recording was associated with Hector's unique pin code that he was assigned while detained.

Further, Sonia's statements are excluded from hearsay under Rule 801(d)(2)(E).[5] FED. R. EVID. § 801(d)(2)(E). The government presented much testimony demonstrating that Sonia was Ventura's right-hand woman, qualifying her as a coconspirator. *See Bourjaily v. United States*, 483 U.S. 171, 176 (1987) ("[W]e hold that when the preliminary facts relevant to Rule 801(d)(2)(E) are disputed, the offering party must prove them by a preponderance of the evidence."). Further, these statements—which

---

[5] Rule 801(d)(2)(E) categorizes statements that are "offered against an opposing party" and "made by the party's coconspirator during and in furtherance of the conspiracy" as "not hearsay." FED. R. EVID. § 801(d)(2)(E).

instruct Hector to lie about his status and how he connected with Deon and Xiomara—undoubtedly further the smuggling operation. *See United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000) ("Efforts to conceal an ongoing conspiracy obviously can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end.").

Our precedent also forecloses the Confrontation Clause challenge. *See United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011) (noting "that '[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination'" (alteration in original) (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004))). Sonia's statements made in furtherance of the conspiracy are not testimonial. *See id.* (holding that coconspirator statements "generally" do not qualify as testimonial); *see also United States v. Duron-Caldera,* 737 F.3d 988, 992–93 (5th Cir. 2013) ("[A] statement is testimonial if its 'primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution.'" (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006))).

For these reasons, the judge certainly did not abuse his discretion when he admitted the recordings.

### (2) Officer Testimony

We also have Ventura's challenge to the testimony of Officer Villarreal. Officer Villarreal conducted a wellness check at Sonia's home after receiving a phone call that a woman was being held without consent. He testified that he found nobody in Sonia's home. Ventura argues that these statements were highly prejudicial—they served no purpose other than to inflame the passions of the jury.

Defendants raising challenges on appeal under Federal Rule of Evidence 403 must overcome the "especially high level of deference" we

give district court determinations, which are only overturned in light of a "clear abuse of discretion." *United States v. Rider*, 94 F.4th 445, 456 (5th Cir. 2024) (quotation omitted). It is true that Officer Villarreal's testimony appears to serve very little useful purpose outside of implicating Sonia (and the other coconspirators) in an uncharged kidnapping. However, the prejudice must be "*substantial*[]" for evidence to be excluded under Rule 403. FED. R. EVID. 403 (emphasis added). Officer Villarreal's testimony was extremely brief, taking up roughly three pages of the over-1,000-page trial transcript. Further, other witnesses, like Morales-Sanchez and his sister-in-law, had already testified that they observed undocumented individuals remaining in Sonia's house until they could pay for the transportation services, and Officer Villarreal's testimony arguably serves to reinforce that testimony. Thus, we cannot conclude that the district judge "clearly" abused his discretion when he found the prejudicial impact of the testimony did not substantially outweigh its probative value.[6] *Rider*, 94 F.4th at 456.

## B. Sufficiency of the Evidence

Last but not least, Ventura argues that the evidence was insufficient to demonstrate an agreement to transport illegal aliens or that she had knowledge of the aliens' illegal status. Because Ventura moved for a judgment of acquittal at the close of the government's case, we review her challenges to the sufficiency of the evidence de novo. *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007).

---

[6] Moreover, we note that Officer Villarreal ultimately testified that he found nobody in Sonia's house, which helps Ventura. Accordingly, even if we agreed that his testimony should have been excluded under Rule 403, its admission was harmless.

"[A] defendant seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) (quotation omitted). We afford great deference to the jury's verdict, viewing the evidence in the light most favorable to it. *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018). When doing so, we ask if any rational trier of fact could conclude that the defendant committed the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To convict Ventura, the government had to prove that she: "(1) agreed with one or more persons (2) to transport an undocumented alien inside the United States (3) in furtherance of his unlawful presence (4) knowingly or in reckless disregard of the fact that the alien's presence in the United States was unlawful." *United States v. Jiminez-Elvirez*, 862 F.3d 527, 533–34 (5th Cir. 2017). To establish an agreement, the government need not produce direct evidence; a jury can "infer[] from the facts and circumstances of a particular case" that two individuals were coconspirators if they acted in concert, or if they tacitly decided to work together. *United States v. Robertson*, 659 F.2d 652, 656 (5th Cir. 1981); *see United States v. Bieganowski*, 313 F.3d 264, 277 (5th Cir. 2002). To support a defendant's knowledge of an alien's illegal status, we have previously considered evidence that individuals were attempting to hide from law enforcement in the presence of the defendant, *United States v. Romero-Cruz*, 201 F.3d 374, 379 (5th Cir. 2020), and evidence of a "pre-arranged situation" between an alien and a defendant, *United States v. Battle*, 368 F. App'x 560, 563 (5th Cir. 2010) (per curiam). Although the government may use circumstantial evidence to prove any element of the crime, it cannot rely on "an overly attenuated piling of inference on inference." *United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011) (quotation omitted).

In short, the evidence that the government produced at trial was sufficient for a rational juror to convict Ventura. Multiple people testified as

to having been paid by Ventura, or paying Ventura, for transportation from the Mexico-Texas border.[7] She herself was pulled over by law enforcement while transporting an alien, and she had to sign for the release of her own seized vehicle after her husband was referred to Border Patrol for transporting an illegal alien. Further, the government presented phone records between individuals who transported the aliens and Ventura, discussing details regarding the pickups. This certainly indicates that she possessed—at minimum—"reckless disregard" toward their illegal status.[8] There was also evidence that she and Sonia acted in concert: they similarly instructed people to hide themselves in a car trunk and lie about where they were from; they helped move individuals from one car to another; they conducted some trips together; and they paid transporters for their work. It would be quite the leap to hold that all of this, in totality, was still insufficient.

### III.    Conclusion

For the reasons above, we AFFIRM Ventura's conviction.[9]

---

[7] Ventura argues that this testimony is tainted; it all comes from accused coconspirators or illegal aliens, all of whom were promised leniency. But credibility is for the jury to determine, not us. *See United States v. Delgado*, 256 F.3d 264, 273–74 (5th Cir. 2001). Both sides elucidated possible motives for testifying during direct- and cross-examinations, and the district judge informed the jury about the reliability of accomplice testimony. Accordingly, we do not rehash arguments regarding any individual's credibility.

[8] Indeed, the evidence supports that Ventura, along with Sonia, was in charge of the entire smuggling operation. The fact that she would direct and pay *others* to transport the foreign nationals, and rarely did it herself, demonstrates that she had actual knowledge as to the aliens' illegal status.

[9] We note that the opening paragraph of Ventura's brief mentioned her intent to appeal the district judge's sentence of 120 months—the statutory maximum. However, Ventura, who is represented by counsel, provides nothing by way of argument to the sentence. Accordingly, we do not consider her to have challenged anything other than the conviction. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (summarizing our caselaw that inadequately briefed arguments are waived).