United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 21, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

―――――――――――――――

No. 05-10474

―――――――――――――――

UNITED STATES OF AMERICA

            Plaintiff - Appellee

    v.

ARTURO VARGAS-GARCIA

            Defendant - Appellant

―――――――――――――――――――――――――――――――――――――

Appeal from the United States District Court for the
Northern District of Texas, Dallas Division

―――――――――――――――――――――――――――――――――――――

Before KING, Chief Judge, and BARKSDALE and PRADO, Circuit
Judges.

KING, Chief Judge:

    Arturo Vargas-Garcia, the defendant-appellant in this
matter, appeals from the sentence imposed by the district court.
We AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

    On October 12, 2004, Arturo Vargas-Garcia was arrested in
Dallas by special agents from the Bureau of Immigration and
Customs Enforcement.  Vargas-Garcia, a citizen of Mexico, had
been indicted on October 5, 2004, and charged with one count of

1

illegal reentry after removal from the United States,[1] in violation of, inter alia, 8 U.S.C. § 1326.  Specifically, Vargas-Garcia was charged with being "found in the United States" without having received the express consent of the Attorney General to reenter.  Vargas-Garcia made an immediate appearance on October 12, and he pleaded guilty to the illegal reentry charge on December 16, 2004.

Several weeks earlier, on September 12, 2004, Dallas police arrested Vargas-Garcia after he committed a traffic violation.  A Dallas police officer initially stopped Vargas-Garcia for failing to yield the right of way to oncoming traffic, then determined that Vargas-Garcia lacked both a driver's license and proof of insurance.  As the police officer attempted to place him in handcuffs, Vargas-Garcia struck the officer, stated that he could not go to jail as he had returned to the United States after being removed, then fled.  After a brief chase, Vargas-Garcia was apprehended in the closet of a nightclub, and he eventually pleaded guilty to state law charges of resisting arrest, evading arrest, and failure to identify.

This offense, along with numerous others, was included in the presentence report (PSR) prepared in advance of Vargas-Garcia's sentencing hearing for his illegal reentry offense.  On

---

[1]     Vargas-Garcia had been removed on September 14, 2001, after being apprehended for unlawfully entering the United States.

March 31, 2005, the district judge sentenced Vargas-Garcia to custody "for a term of 27 months on an offense level of 11 . . . and a criminal history category of six. In doing so, I consider the Guidelines as advisory and I have taken into consideration the provisions of 18 U.S.C. § 3553(a)."[2]

In this appeal, Vargas-Garcia argues that his criminal history score was erroneously calculated because he was assigned two points for his resisting arrest offense. Vargas-Garcia claims that the resisting arrest offense was not a separate offense, but rather that it was relevant conduct of the instant offense of illegal reentry, since his resisting arrest occurred during the commission of or in the course of attempting to avoid detection or responsibility for his illegal reentry. Cf. U.S. SENTENCING GUIDELINES MANUAL §§ 1B1.3, 4A1.1, 4A1.2 (2004).

Had the district court excluded the resisting arrest offense from his criminal history computation, Vargas-Garcia argues that he would have received an initial offense level of 12 rather than 14, which would have placed him in a criminal history category of five rather than six. Vargas-Garcia acknowledges that the court

---

[2] The total criminal history score recommended by the PSR was 14. PSR ¶ 32. Therefore, the offense level of 11 used by the district court represented a downward departure (based on cultural assimilation) from the initial level based on the PSR alone.

The district court also sentenced Vargas-Garcia to two years of supervised release after his term of incarceration ends. As a condition of his supervised release, Vargas-Garcia will be immediately surrendered to the relevant immigration officials for removal proceedings.

sentenced him below the Guidelines range, but he argues that it took his (incorrectly determined) criminal history category into consideration when it decided the extent of the departure. Therefore, he argues that it is "reasonably probable" that his sentence would have been lower absent the error.

## II. STANDARD OF REVIEW

Vargas-Garcia concedes that he failed to raise this issue before the district court. Because he did not make this objection in the district court, this court will review for plain error. United States v. Mora, 994 F.2d 1129, 1142 (5th Cir. 1993); see also United States v. Henry, 288 F.3d 657, 665 (5th Cir. 2002) (stating that when "a defendant fails to object properly at sentencing, he waives his right to full appellate review, and this Court reviews only for plain error"). To demonstrate plain error, an appellant must show clear or obvious error that affects his substantial rights; if he does, this court may correct a forfeited error that seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Lewis, 412 F.3d 614, 616 (5th Cir. 2005); see also United States v. Krout, 66 F.3d 1420, 1434 (5th Cir. 1995) (stating that "to show plain error, the appellant must show that there was an error, that it was plain (meaning 'clear' or 'obvious') and that the error affects substantial rights").

In resolving Vargas-Garcia's claim that the district court misapplied the Sentencing Guidelines, we review the district

4

court's interpretation and application of the Guidelines de novo. See <u>United States v. Villegas</u>, 404 F.3d 355, 359 (5th Cir. 2005); see also <u>United States v. Garza-Lopez</u>, 410 F.3d 268, 273 (5th Cir. 2005).

## III. DISCUSSION

**A.   Vargas-Garcia's Presentence Report**

In this appeal, Vargas-Garcia argues that his resisting arrest offense was not a separate offense, but rather was relevant conduct of the illegal reentry, since his resisting arrest occurred during the commission of or in the course of attempting to avoid detection or responsibility for his illegal entry.  In his own words, "Mr. Lopez-Vargas' [sic] 'resisting arrest' offense is plainly 'part of the instant offense' within the meaning of USSG § 4A1.2(a)(1), and the district court therefore erred in counting it as part of his criminal history score."

Vargas-Garcia's argument revolves around Section 4A1.1 of the Sentencing Guidelines, which addresses the manner in which a defendant's criminal history is determined.  One to three points are awarded to a defendant's criminal history for each "prior sentence" he has received within certain specified time frames. U.S. SENTENCING GUIDELINES MANUAL § 4A1.1(a)-(c) & cmt. nn. 1-6 [hereinafter U.S.S.G.].  A "prior sentence" is defined as "any sentence previously imposed upon adjudication of guilt . . . for

conduct not part of the instant offense." U.S.S.G.

§ 4A1.2(a)(1). The term "prior sentence" is broadly defined as

"a sentence imposed prior to sentencing on the instant offense,

other than a sentence for conduct that is part of the instant

offense." U.S.S.G. § 4A1.2 cmt. n.1. On the other hand,

"[c]onduct that is part of the instant offense means conduct that

is relevant conduct to the instant offense under the provisions

of § 1B1.3 (Relevant Conduct)." Id. Therefore, unlike a prior

offense resulting in a prior sentence, relevant conduct that is

part of the instant offense does not create additional criminal

history points. Relevant conduct is defined in the Guidelines as

"all acts and omissions committed, aided, abetted, counseled,

commanded, induced, procured, or willfully caused by the

defendant . . . that occurred during the commission of the

offense of conviction, in preparation for that offense, or in the

course of attempting to avoid detection or responsibility for

that offense . . . ." U.S.S.G. § 1B1.3(a)(1).

Vargas-Garcia acknowledges that the district court sentenced

him below his initially determined Guidelines range, but he

argues that the court, treating his resisting arrest offense as a

prior offense, rather than as relevant conduct, took his

(incorrectly determined) criminal history category of six into

consideration when it decided the extent of the departure.

Therefore, even though the final offense level of 11 used by the

6

district court is lower than the offense level of 12 argued for in this appeal, Vargas-Garcia believes that it is "reasonably probable" that his amended offense score and his ultimate sentence would have been even lower if the district court had begun its calculations with his figures.

The government, which also could have brought this matter to the attention of the district court, now concedes that the district court erred in counting Vargas-Garcia's resisting arrest offense separately from his illegal reentry. Instead, the government argues that the district court's sentence should be affirmed because it was reasonable, because Vargas-Garcia has not shown that the error seriously affected the fairness, integrity, or public reputation of the sentencing hearing, and because Vargas-Garcia has not shown that correcting the error would result in a lower sentence. In other words, the government would have us pass over the precise impact of the Guidelines upon Vargas-Garcia's sentence and instead address the general question of the overall reasonableness vel non of the district court's sentence, taken as a whole, on a plain error standard.

As an initial matter, we observe that we are not bound by the government's concessions. See, e.g., United States v. Claiborne, 132 F.3d 253, 254-55 (5th Cir. 1998) (per curiam) (holding that "the district court did not misapply the [Sentencing] Guidelines" despite the government's contrary

7

concession).  We do not accept the government's suggested

blueprint for this case because, even in the wake of United

States v. Booker, --- U.S. ----, 125 S. Ct. 738 (2005), our

review of a sentence imposed by a lower court must begin with the

Sentencing Guidelines and the calculation of the Guidelines by

the lower court, especially where the lower court has imposed

what it considered to be a Guidelines sentence (with a downward

departure).  See generally United States v. Mares, 402 F.3d 511

(5th Cir. 2005).  In Mares, our "first sentencing decision since

the Supreme Court issued Booker/Fanfan," we recognized that

"[t]he Remedy Opinion in Booker makes it unmistakably clear . . .

that the [Sentencing Reform Act], with the exception of the

excised provisions, remains intact."  Mares, 402 F.3d at 517,

518.  Therefore, even under "the discretionary sentencing system

established by Booker/Fanfan, a sentencing court must still

carefully consider the detailed statutory scheme created by the

[Sentencing Reform Act] and the Guidelines," and these factors

must continue to "'guide appellate courts, as they have in the

past, in determining whether a sentence is unreasonable.'"  Id.

at 518 (quoting Booker, 125 S. Ct. at 766).  Accordingly, we must

first consider the district court's calculation of the Guidelines

before turning to the broader reasonableness issues urged upon us

by the government.  As explained above, in making this

determination, we review the district court's interpretation and

application of the Guidelines de novo.  Villegas, 404 F.3d at

8

359.

We hold that the district court's decision to count Vargas-Garcia's resisting arrest offense, which, after all, occurred pursuant to a traffic violation, as an offense separate from his illegal reentry offense for sentencing purposes was not plainly erroneous, if, indeed, it was error at all. To hold otherwise, and to adopt Vargas-Garcia's conclusions, would impose an unfounded and bizarre gloss upon illegal reentry law.

The illegal reentry statute defines Vargas-Garcia's offense thusly: a removed alien commits illegal reentry when he "enters, attempts to enter, or is at any time found in, the United States . . . ." 8 U.S.C. § 1326(a)(2). Ordinarily, illegal reentry is "uncomplicated and is complete as soon as the entry or attempt is made." United States v. Rivera-Ventura, 72 F.3d 277, 281 (2d Cir. 1995) (citing H.R. Rep. No. 1365, 82d Cong. 2d Sess. (1952), as reprinted in 1952 U.S.C.C.A.N. 1653, 1683 (stating that "[n]ormally an entry occurs when the alien crosses the border of the United States and makes a physical entry, and the question of whether an entry has been made is susceptible of a precise determination")). When a removed alien is indicted for illegal reentry under the third prong of the statute, after being "found in" the United States, as was Vargas-Garcia, the offense "is somewhat more complex, since it depends not only on the conduct of the alien but also on acts and knowledge of the federal authorities." Rivera-Ventura, 72 F.3d at 281. Because "the

9

alien may be in the United States unlawfully after making a surreptitious border crossing that conceals his presence . . . the offense of being 'found in' the United States in violation of § 1326(a) is not complete until the authorities both discover the illegal alien in the United States and know, or with the exercise of diligence typical of law enforcement authorities could have discovered, the illegality of his presence." Id. at 281-82 (internal citations omitted). Therefore, "[t]o the extent that § 1326(a) makes it a crime to be 'found in' the United States, that provision is the practical equivalent of making unlawful 'entry' a continuing offense until at least such time as the alien is located." Id. at 282. But this complexity, and the continuing nature of the offense, do not require us to adopt Vargas-Garcia's conclusions in this appeal.

Although illegal reentry after a surreptitious or unannounced border crossing may be a continuing offense until an alien is found by the relevant authorities, the concealed and extended nature of this offense cannot shield multiple and "severable instances of unlawful conduct" from their appropriate consequences at sentencing. Cf. United States v. Banashefski, 928 F.2d 349, 352 (10th Cir. 1991) (discussing the nature of prior offenses under the Guidelines and affirming a sentence for a felon in possession of a firearm that relied upon a previous state conviction for possession of a stolen car). As the Sixth Circuit held in affirming drug conspiracy and money laundering

10

sentences that relied upon a previous state conviction for carrying a concealed weapon, the concept of separable prior offenses is based on "different criminal conduct that harmed different societal interests," involving two or more offenses that "occurred at different times and places." United States v. Beddow, 957 F.2d 1330, 1339 (6th Cir. 1992). It was not plain error (if it was error at all, which we do not decide) for the district court to conclude that Vargas-Garcia's evasion of and resistance to arrest after a traffic stop weeks before his indictment for illegal reentry was a separate prior offense because it could be seen as embodying just such conduct severable by time, place, and harmed societal interest. Moreover, adopting Vargas-Garcia's broad conclusions would require district courts to excise every crime committed after an alien's actual illegal reentry but before his discovery by law enforcement from the alien's criminal history at sentencing, giving convicted criminals a license to run amok based solely on the nature of their criminality. Cf. Beddow, 957 F.2d at 1339 (affirming a district court's sentence and stating that adopting the "broad interpretation of offense conduct" advanced by a defendant-appellant "would render almost every crime committed contemporaneously with some other offense part of that offense under U.S.S.G. § 4A1.2").

Echoing the reasoning of the Second Circuit, we believe "that the 'found in' clause [of 8 U.S.C. § 1326] was included to

11

make it clear that if an alien illegally reenters the United States after deportation, he is subject to prosecution even if the government does not discover him or the illegality of his entry until after the time to prosecute him for illegal entry has expired." Rivera-Ventura, 72 F.3d at 282. This flexible, practical intent directly contradicts Vargas-Garcia's conclusions. In sum, Vargas-Garcia would have us adopt an interpretation of the illegal reentry statute contrary to common sense, the clear intent behind the statute, the holdings of our sister circuits and the well-settled understanding of prior offenses and relevant conduct. This we decline to do.

To support his conclusions, Vargas-Garcia claims that in the past this court "has repeatedly taken an extraordinarily broad view regarding exactly what may comprise 'part of the instant offense.'" (Appellant's Br. at 5 (citing, inter alia, United States v. Henry, 288 F.3d 657, 658 (5th Cir. 2002); United States v. Corro-Balbuena, 187 F.3d 483, 486 (5th Cir. 1999); United States v. Santana-Castellano, 74 F.3d 593, 598 (5th Cir. 1996)).) Vargas-Garcia suggests that his conclusions are compelled by this court's prior holdings, but his reliance on our decisions in Henry, Corro-Balbuena, and Santana-Castellano is misplaced. Contrary to Vargas-Garcia's suggestions, the precise issue at hand differs from the central issues in the cases just named, and our reasoning in these cases actually undercuts his assertions.

In Henry, this court held that an appellant demonstrated

12

that the district court had committed plain error "by including two points in his criminal-history calculation for a prior one-year sentence . . . that was imposed upon an adjudication of guilt for conduct that was part of the offense of conviction." Henry, 288 F.3d at 665. Henry involved crimes of criminal trespass and possession of a firearm while under a restraining order, not illegal reentry and resisting arrest. Moreover, our ruling in Henry was based on the fact that both offenses "clearly resulted from the same conduct on [the exact same date]." Id. The facts relevant to this appeal present no such clear identity of conduct and time, since Vargas-Garcia's traffic violation, and the resisting arrest offense it spawned, occurred weeks before he was indicted for illegal reentry.

Corro-Balbuena and Santana-Castellano offer no greater support for Vargas-Garcia's argument. In both cases, this court held that when "a deported alien enters the United States and remains here with the knowledge that his entry is illegal, his remaining here until he is 'found' is a continuing offense . . . ." Santana-Castellano, 74 F.3d at 598; see also Corro-Balbuena, 187 F.3d at 485 (stating that "[s]ection 1326 sets forth a continuing offense . . . . [that] begins at the time the defendant illegally reenters the country and does not become complete unless or until the defendant is found by the INS in the United States") (internal citations omitted). Since illegal reentry was cognized in these cases as a continuing offense,

13

Vargas-Garcia contends that his earlier resisting arrest offense should be understood as relevant conduct of his own broader, continuing illegal reentry offense.

Neither case offers any aid to Vargas-Garcia. In <u>Santana-Castellano</u>, this court interpreted an appellant's illegal reentry as a continuing offense in order to give "common sense effect to . . . [8 U.S.C.] § 1326." <u>Santana-Castellano</u>, 74 F.3d at 598. The defendant-appellant in <u>Santana-Castellano</u> was convicted of illegal reentry after being found in prison by immigration officials while serving a five-year state sentence for the offense of injury to a child. <u>Id.</u> at 595-96. During sentencing for the illegal reentry, the federal district court in <u>Santana-Castellano</u> sentenced the defendant-appellant based on a PSR that included "two [criminal history] points under U.S.S.G. § 4A1.1(d) for having committed the offense of reentering while under a state sentence of imprisonment." <u>Id.</u> at 596. On appeal, the defendant-appellant in <u>Santana-Castellano</u> argued "that the two point criminal history enhancement should not have been applied because he committed the criminal reentry prior to his prosecution and sentence for injury to a child, not during his incarceration in state prison." <u>Id.</u> After analyzing the "found in" prong of the illegal reentry statute, we affirmed the two-point sentencing enhancement applied by the district court, holding that § 1326 "is obviously intended to extend the definition of the offense to include those situations where the

14

alien is the only one who knows the precise date of his surreptitious entry and knows that he has violated the law in reentering the country after he has been arrested and deported." Id. Far from supporting Vargas-Garcia's arguments, our reasoning in Santana-Castellano actually supports the district court's sentence: there, as here, we rejected a defendant-appellant's arguments and affirmed a district court's reasoning at sentencing in order to preserve the "common sense effect" and "obvious[] inten[t]" of 8 U.S.C. § 1326. Id. at 598.

In Corro-Balbuena, this court held that the defendant-appellant's illegal reentry was a continuous offense because he had illegally reentered the United States at least five times, with at least four illegal reentries occurring in less than two years. See Corro-Balbuena, 187 F.3d at 484-85. The defendant-appellant in Corro-Balbuena was discovered by immigration officials while in state custody for driving with a suspended license, and he eventually pleaded guilty to illegal reentry in violation of 8 U.S.C. § 1326. Id. at 485. On appeal, the defendant-appellant in Corro-Balbuena argued that "his § 1326 offense [could] only be defined with reference to his most recent illegal reentry," and he maintained "that the district court was not free to consider, either as part of the instant offense or as relevant conduct, the four prior unlawful reentries when imposing his sentence." Id. at 486. We disagreed, affirming the district court's calculation and sentence and holding that the illegal

15

reentry could be understood as a continuous offense because, although it was "impossible to pinpoint the exact date on which Corro-Balbuena [last] illegally reentered the United States," "[e]ach or any of these multiple surreptitious and illegal reentries may be used" to support the district court's sentence. Id.  This appeal is quite different: although it is unclear when Vargas-Garcia illegally reentered the United States after his 2001 removal, there is no suggestion of multiple surreptitious border crossings before his discovery by immigration officials, nor would such crossings be relevant to the prior offense pattern if they in fact occurred.  Therefore, our justification in Corro-Balbuena for interpreting illegal reentry as a continuing offense is absent in this appeal; in fact, the flexibility and common sense that governed our interpretation of 8 U.S.C. § 1326 in Corro-Balbuena guide our holding today.

For the reasons stated above, we conclude that our past holdings do not compel us to conclude that the district court plainly erred in treating Vargas-Garcia's resisting arrest offense as part of his prior criminal history.  Vargas-Garcia does not challenge the reasonableness of his sentence or, indeed, any aspect of the sentence other than the calculation under the Guidelines of his criminal history score.

## B.   Vargas-Garcia's Almendarez-Torres Argument

Vargas-Garcia also contends that the district court erred by

treating his prior aggravated felony conviction as a sentencing factor rather than as an element of his offense because it was not alleged in his indictment, nor was it ever established beyond a reasonable doubt.  In Almendarez-Torres v. United States, 523 U.S. 224 (1998), the Supreme Court rejected claims that prior offenses must be treated as separate elements of a charged offense, holding instead that prior convictions can be treated as sentencing factors in an illegal reentry context.  This issue is foreclosed before this court by United States v. Izaquirre-Flores, 405 F.3d 270, 277-78 (5th Cir. 2005), cert. denied, 126 S. Ct. 253 (2005) (quoting United States v. Dabeit, 231 F.3d 979, 984 (5th Cir. 2000), for the proposition that this court must follow Almendarez-Torres "unless and until the Supreme Court itself determines to overrule it").  Vargas-Garcia correctly concedes that relief on this issue remains foreclosed before this court by Almendarez-Torres and Izaquirre-Flores.  He raises this issue only to preserve it for possible Supreme Court review, and we decline to consider it further.

## IV. CONCLUSION

For the reasons stated above, we AFFIRM.