United States Court of Appeals
Fifth Circuit

**F I L E D**

April 12, 2007

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-51209

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JUAN VICTOR VALLES, also known as
Smiley; JOHNNY GARCIA-ESPARZA,
also known as Gira; SAMMY GARCIA,
also known as Spiderman; JIMMY
ZAVALA, also known as Panson,
also known as Gordo,

Defendants-Appellants

----------------------
Appeals from the
United States District Court
for the Western District of Texas
----------------------

Before KING, WIENER, and OWEN, Circuit Judges.

Per Curiam:

Defendants-Appellants Juan Victor Valles, Johnny Garcia-
Esparza, Sammy Garcia, and Jimmy Zavala were indicted for
numerous illegal acts stemming from their involvement in the
Texas Mexican Mafia ("TMM"). After a lengthy trial, a jury
returned guilty verdicts against each defendant on each count of
their respective indictments. The district court sentenced the
defendants to lengthy terms of imprisonment. The defendants now
appeal their convictions and sentences. Concluding that the

district court committed no error, we affirm the defendants' convictions and sentences.

## I.  FACTS AND PROCEEDINGS

A.  <u>Origins of the TMM</u>

The TMM — officially named "Mexikanemi" (Spanish for "free-Mexicans") and often referred to as "La Eme" (a phonetic reference to "Mexikanemi") — was formed in the mid-1980s by Heriberto Huerta, while he was imprisoned in a federal penitentiary.  He did so after he obtained permission from the Mexican Mafia of California to establish a similar organization in Texas.  According to the TMM constitution, which has remained virtually unchanged since it was drafted in the mid-1980s, the TMM is a criminal organization functioning in "whatever aspect or criminal interest for the benefit of advancement of Mexikanemi" and willing to "traffic in drugs, contract murders, prostitution, major robberies, gambling, arms and anything else [it] can imagine."

The TMM originally operated exclusively inside prisons, both federal and state.  As TMM members were released or paroled from prison, however, the TMM spread outside prison to cities within Texas, including San Antonio, Houston, Dallas, Midland, Odessa, and El Paso.  It now has a significant presence in the federal prison system, the Texas state prison system, and throughout the

2

state of Texas.

B.    <u>Internal Structure of the TMM</u>

The TMM is organized in a hierarchical military structure. At the top are a president and vice president, "who are responsible for all that occurs in the Mexikanemi." Huerta, who is now incarcerated in a different federal penitentiary, is still president of the TMM. Benito Alonzo, a prisoner in a Texas state penitentiary, is the vice president.

Serving directly under the president and vice president are the TMM generals, who "are responsible for all that happens in the region of which they are in charge" and for "maintaining communication with the president and vice president so that everything will always be organized because [the TMM is] an organization." Immediately under the generals are the captains and then the lieutenants, who are responsible for the city where they reside or the prison where they are incarcerated, as the case may be. Under the lieutenants are the sergeants, who "are responsible for maintaining order wherever they are." At the bottom of this pyramid are the rank-and-file soldiers, who have the obligation "to attempt to do the best possible in [the TMM's] objective to progress and to advance everything with the Mexikanemi."

Despite any hierarchical differences within the TMM, its

constitution expressly establishes that all TMM members "have the obligation of serving and obeying all the rules equally just like any other soldier or brother because all [TMM members] are soldiers and all [TMM members] are Mexican and all [TMM members] are equal." This notion of equality is further exemplified in the TMM's punitive recourse, which provides that "[a]ny member of the Mexikanemi, and it does not matter if it is the president, vice president, general, lieutenants or sergeants or soldiers, that violate the rules of the Mexikanemi must suffer the consequences." These consequences usually constitute death and always do so in the case of disloyalty or treason.

Even though the TMM is a single organization, its hierarchical structure is divided into two separate and distinct chains of command. The TMM's ranking system is split between those members in prison and those outside of prison or "on the street." Thus, there are TMM prison generals, captains, lieutenants, sergeants, and soldiers, and there are street generals, captains, lieutenants, sergeants, and soldiers. TMM prison members only have authority over the TMM's activities within prison, and TMM street members only have authority over activities outside of prison.

Because of this dichotomy, the TMM has developed a policy governing TMM members who are released or paroled from prison.

4

When a TMM prison member is released, he is given a certificate of good-standing from the ranking TMM prison official and must then report to the city where he formerly resided. On his return, the TMM member must present his certificate to the sergeant in charge of the section of the city where the returning member formerly resided. The TMM officials in that area must then investigate the returning member to ensure that he is in good standing. Once it has been determined that the returning member has met the necessary requirements, he becomes a street member of the TMM, starting at the rank of soldier, regardless of what his rank had been in prison. Similarly, a street member who is convicted and sent to prison surrenders his street rank and starts anew in prison. The president and vice president, however, retain their rank and corresponding authority whether they are in prison or on the street.

C.  Membership in the TMM

Membership in the TMM was originally limited to convicts while they were in prison. As the organization evolved, the TMM began to allow non-convicts to become members, but only sparingly.

The TMM constitution designates that all TMM members "are responsible for recruiting soldiers and each member which recommends a soldier will be responsible for his recommendation

5

even though the recommendation results as an honorable one or one who deceives." Under this system, a prospective member — referred to as a "prospecto" — must be recommended for membership by a current member, who is designated as a sponsor or "padrino" (Spanish for "godfather"). If the prospecto fouls up after he is initiated, his sponsor is responsible for resolving the matter, killing the prospecto if necessary. In recommending a prospecto, the sponsor must submit the prospecto's name to the entire membership to acquire as much background information on the prospecto as possible. If the prospecto is found to be acceptable, he begins a six-month probation period, at the end of which he will be accepted as a member, barring any setbacks.

TMM members refer to each other as "carnal" (Spanish for "brother") or "merecido" (Spanish slang for "a true, hard-core Mafia guy"), and commonly use tattoos for identification. At first, the tattoos were mandatory for TMM members, but they are no longer required, because they hindered the TMM's ability to infiltrate rival gangs and made its members easy targets for law enforcement. Nonetheless, they are still commonly displayed.

There are several tattoos that are common among TMM members. One of these tattoos is the sequence of the arabic numerals "5, 13, 5" or the Roman numerals "V, XIII, V." The "5" or the "V" represent the fifth letter in the alphabet, "E." The "13" or the

6

"XIII" represent the thirteenth letter in the alphabet, "M." This sequence therefore spells "Eme," the abbreviation for Mexikanemi. Another tattoo is shaped like a spider, with two "E"'s forming the legs of the spider and one "M" forming the body. Other popular tattoos comprise the Aztec symbol of an eagle clutching a snake and the word "Mexikanemi" spelled out.

D.   The TMM in San Antonio

San Antonio is the capital of the TMM, with a membership of approximately 500. It is divided into four "eschenas" (Spanish for "corners"), North, South, East, and West. The West corner is the strongest. A lieutenant commands each corner, with a captain overseeing the four lieutenants and a general ultimately responsible for the entirety of San Antonio.

In the late 1990s, the TMM in San Antonio increased its involvement in drug trafficking by forcing non-TMM drug dealers to share the heroin and cocaine they received from Mexico. The higher ranking TMM officials would receive the drugs and distribute them down the chain of command to the lieutenants, who would then distribute to the sergeants, who would then distribute to the soldiers. Between 1998 and 2004, as a result of the TMM's newly established supply source, the TMM imported and distributed large amounts of heroin and cocaine, moving at least one kilogram of heroine and one to two kilograms of cocaine a week.

7

Not only did the TMM in San Antonio make money from directly distributing drugs, but they controlled drug distribution by extorting a street tax — known as "the dime" or "el daime" (Spanish for "the dime") — from rival drug dealers. When the presence of a non-TMM drug dealer came to the attention of the TMM, it would send a member to confront the drug dealer and inform him that he had to pay ten percent of his drug proceeds to the TMM. In return for the dime, the TMM allowed drug dealers the privilege of dealing and provided protection from other dealers. In addition to charging the dime prospectively, the TMM would impose a retroactive tax on the amount of drugs proceeds that had already accrued.

If a rival drug dealer refused to pay the dime, the TMM would conduct a "home invasion," in which a large number of armed TMM members would break into the drug dealer's home and take everything of value, including automobiles. If a drug dealer refused to pay the dime after a home invasion, the TMM would then have the drug dealer killed.

To further their drug trafficking and extortion practices, the TMM maintained a vast storehouse of firearms, which were kept in a secret location, known only to high ranking TMM officials. If a soldier was sent to collect the dime, participate in a home invasion, or execute a "green light" (i.e., a homicide), the TMM

8

would have their firearms custodian furnish the necessary weaponry to the soldier. After the mission had been completed, the soldier would return the weapon to the custodian, who would either destroy the weapon or hide it in a different location. Between the late 1990s and 2004, the TMM in San Antonio executed numerous home invasions and murdered several people, including a number of its own members.

## E. The Defendants

Between the late 1990s and 2004, each of the defendants served with the TMM in San Antonio. Following his initiation into the TMM, Zavala served as lieutenant in the North corner and subsequently was promoted to captain and then general of San Antonio. Garcia-Esparza served as lieutenant in the North corner after Zavala's promotion from that same position. Valles was initially a sergeant, but eventually was promoted to lieutenant in the East corner. Garcia served as the third-man for the North corner. As third-man, Garcia was an assistant to the sergeant of the North corner and functioned as an intermediary between the sergeant and the soldiers.

## F. The Indictment

In August 2004, a federal grand jury returned a 33-count indictment against 28 TMM members. Count One charged all 28 TMM members with conspiring to distribute and to possess with the

9

intent to distribute a kilogram or more of heroin and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. Count One alleged that between August 1, 1999 and August 1, 2004, the TMM, through these 28 defendants, conspired among each other and agreed to distribute and possess with the intent to distribute heroin and cocaine, then committed the following overt acts in furtherance of the conspiracy: (1) obtained heroin and cocaine in large quantities and distributed it among members of the TMM for further distribution and sale; (2) controlled the distribution of heroin and cocaine by restricting drug trafficking among non-members of the TMM, exclusively to those non-members who paid the dime to the TMM; (3) protected authorized drug distributors from robbery, violence, and competition; and (4) used violence to enforce the TMM's requirement that all drug distributors pay the dime.

Count Thirteen charged Valles and two other TMM members with distributing a mixture and substance containing a detectable amount of heroin on January 29, 2004, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2.

Count Seventeen charged Garcia-Esparza and another TMM member with distributing a mixture and substance containing a detectable amount of heroin on March 17, 2004, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.

10

Count Eighteen charged Garcia-Esparza and another TMM member with distributing a mixture and substance containing a detectable amount of heroin on March 23, 2004, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.

Count Nineteen charged Garcia-Esparza and another TMM member with distributing a mixture and substance containing a detectable amount of heroin on March 30, 2004, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.

Count Twenty charged Garcia-Esparza, Garcia, and another TMM member with distributing a mixture and substance containing a detectable amount of heroin on April 22, 2004, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.

Count Twenty-One charged Zavala and another TMM member with possessing with the intent to distribute five hundred grams or more of a mixture and substance containing a detectable amount of cocaine on April 22, 2004, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2.

Count Thirty charged Zavala, Garcia-Esparza, and four other TMM members with conspiring to knowingly use, carry, and posses at least one of fifty individually listed firearms in furtherance of a drug trafficking crime (Count One of the Indictment) from August 1, 1999 to August 1, 2004, in violation of 18 U.S.C. §§ 924(c), (o).

11

Count Thirty-One charged Zavala, Garcia-Esparza, and four other TMM members with knowingly using, carrying, and possessing at least one of fifty individually listed firearms in furtherance of a drug trafficking crime (Count One of the Indictment) on April 29, 2004, in violation of 18 U.S.C. §§ 924(c), (o), and 18 U.S.C. § 2.

Count Thirty-Two charged Zavala, Valles, and Garcia with knowingly using, carrying, and possessing a Taurus .9 millimeter handgun, bearing serial number L20209; and a Davis Industries .380 caliber handgun, bearing serial number AP355098, in furtherance of a drug trafficking crime (Count One of the Indictment), in violation of 18 U.S.C. §§ 924(c) and 2.

Count Thirty-Three charged all 28 defendants with conspiring to conduct financial transactions that involved property which was the proceed of unlawful activity, by collecting a mandatory tax on the proceeds of narcotic sales in exchange for granting the drug dealer authorization to sell narcotics, in violation of 18 U.S.C. § 1956(a)(1)(A)(I).

The trial of Zavala, Garcia-Esparza, Valles, and Garcia commenced early in April 2005. More than two weeks later, the jury returned guilty verdicts as to each defendant on each count.

In addition to the criminal charges, the verdict form required the jurors to determine beyond a reasonable doubt

12

whether: (1) Zavala was a leader or organizer of the conspiracy alleged in Count One, (2) Garcia was a leader or organizer of the conspiracy alleged in Count One, (3) Garcia-Esparza was a leader or organizer of the conspiracy alleged in Count One, (4) Zavala committed a home invasion on Steve Pedraza on May 14, 2003, and (5) Zavala intentionally and knowingly killed Jose Luis Moreno. The jury answered interrogatories 1, 3, and 4, "yes," and numbers 2 and 5, "no." When the verdict was returned, Valles made an oral motion for a new trial, which was denied.

In August 2005, the district court sentenced Zavala to life imprisonment on Count One; 480 months imprisonment on Count Twenty-One; and 240 months on each of Counts Thirty and Thirty-Three, each to be served concurrently. The district court further sentenced Zavala to 60 months imprisonment on Count Thirty-One to be served consecutively to Counts One, Twenty-One, Thirty, and Thirty-Three. The court also sentenced Zavala to 300 months imprisonment on Count Thirty-Two to be served consecutively to Counts One, Twenty-One, Thirty, Thirty-One, and Thirty-Three, and imposed a five year term of supervised release as to Counts One, Twenty-One, Thirty-One, and Thirty-Two, and a three year term of supervised release as to Counts Thirty and Thirty-Three, each to be served concurrently.

In the same month, the district court sentenced Valles to

13

600 months imprisonment on Count One and 240 months imprisonment on each of Counts Thirteen and Thirty-Three, each to be served concurrently. The court also sentenced Valles to 60 months imprisonment as to Count Thirty-Two, to be served consecutively to the other sentences, and imposed a five year term of supervised release on each of Counts One and Thirty-Two, and a three year term on Counts Thirteen and Thirty-Three, each to be served concurrently.

Also that month, the district court sentenced Garcia to 600 months imprisonment on Count One and 240 months imprisonment on each of Counts Twenty and Thirty-Three, each to be served concurrently. The court also sentenced Garcia to 60 months imprisonment on Count Thirty-Two, to be served consecutively to the other sentences, and imposed a five year term of supervised release on each of Counts One and Thirty-Two, and a three year term on each of Counts Twenty and Thirty-Three, each to be served concurrently.

The following month, the district court sentenced Garcia-Esparza to 660 months imprisonment on Count One and 240 months on each of Counts Seventeen, Eighteen, Nineteen, Twenty, Thirty, and Thirty-Three, each to be served concurrently. The court also sentenced Garcia-Esparza to 60 months imprisonment on Count Thirty-One to be served consecutively to the other counts, and

14

imposed a five year term of supervised release on each of Counts One and Thirty-One, and a three year term of supervised release on Counts Seventeen, Eighteen, Nineteen, Twenty, Thirty, and Thirty-Three, each to be served concurrently.

Each defendant timely filed a notice of appeal.

## II.  LAW AND ANALYSIS

A.   Garcia-Esparza's Claim of Insufficiency of the Evidence

Garcia-Esparza claims that there was insufficient evidence to support his conviction on any of Counts One, Seventeen, Eighteen, Nineteen, Twenty, Thirty, and Thirty-Two.

1.   Standard of Review

In reviewing the sufficiency of the evidence to support a conviction, we ordinarily review the jury's verdict by determining whether a rational juror could have found the elements of the offense proved beyond a reasonable doubt.[1]  In so doing, we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in support of the jury verdict.[2]  When a defendant fails to move for a judgment of acquittal and thereby fails to preserve the issue for appeal, however, we review to determine only whether the conviction amounts to a manifest miscarriage of

---

[1] United States v. Yi, 460 F.3d 623, 629 (5th Cir. 2006).

[2] Id.

15

justice.[3]  Under this standard, we will reverse a conviction only if the record is devoid of evidence pointing to guilt.[4]

### 2.  Merits

As Garcia-Esparza failed to move for a judgment of acquittal in the district court, we review for manifest miscarriage of justice.  Even a cursory review of the record illustrates that it is not devoid of evidence of guilt.  We affirm each of Garcia-Esparza's convictions.

### B.  The Defendants' Motion for Mistrial

All four defendants contend that the district court abused its discretion in denying their motions for a mistrial after government witness Luis Adame, Jr. revealed his gun-shot wound scars to the jury during his testimony.

In its case-in-chief, the government called Adame as a fact witness regarding the TMM's alleged attempt to murder him. Moments into his testimony, Adame began having trouble answering the government's questions.  He stated that he was nervous and, after being asked by the government if wanted to continue testifying at that time, Adame requested to "have a minute and step out . . . ."  After two additional questions from the government regarding Adame's fitness to testify, the court

---

[3] United States v. Partida, 385 F.3d 546, 561 (5th Cir. 2004).

[4] Id.

16

excused Adame, giving him time to overcome his nervousness.

After examining another witness, the government re-called Adame. As soon as he took the stand, and before any questions were asked on direct examination, Adame stated that he was having a panic attack and again requested that he be allowed to step out of the courtroom for a few minutes. The district court again let Adame leave the courtroom.

After examining still another witness, the government again re-called Adame to the witness stand. Before any examination of Adame occurred, a brief bench conference took place, at which counsel for Zavala brought the following information to the court's attention:

> Apparently this witness's father was murdered and there's some indication it might have been related to the Mexican Mafia. Now I asked [the government] if [it] had planned to go into that and [it] said [it] did, and I'm going to object to it unless it's tied to one of our clients. It's much more prejudicial than probative especially in light of the fact that this man has been in and out of the courtroom four times.

In response, the government stated that the information was relevant because it explained why Adame was so emotional. Finding the government's explanation inadequate, the district court granted Zavala's request and told the government, "Don't go there."

When Adame resumed, he testified that he had been a TMM

17

member under the direct authority of Zavala and that, in March 2003, Zavala, Garcia-Esparza, and Valles came to his place of employment — a car lot — and asked about purchasing five kilograms of cocaine from him. After he and Zavala agreed on the sale of five kilograms for $55,000.00, Adame had the five kilograms delivered to the car lot. When the cocaine arrived, Zavala took all five kilograms, but only paid $22,000.00, deducting $33,000.00 as "tax." According to Adame, he objected that Zavala was effectively taking three kilograms without paying. After then being surrounded by Zavala, Garcia-Esparza, Valles, and the rest of the TMM members who were escorting them, Adame acquiesced to Zavala's demand. When asked by the prosecution why this happened, Adame explained that he was being punished for refusing to collect the dime in his neighborhood.

Adame further testified that, two weeks after the initial incident, Zavala, Garcia-Esparza, and Valles returned to the car lot with approximately thirteen or fourteen other TMM members, demanding $30,000.00 in back taxes from him, accusing him of under-reporting his drug sales. As Adame did not have $30,000.00 in his possession, Zavala took Adame's Harley Davidson motorcycle (worth approximately $28,000.00) and pickup truck (worth approximately $9,000.00) as collateral, telling Adame that the vehicles would be returned when Adame paid the $30,000.00.

Adame testified that he called Zavala two hours later and informed him that the $30,000.00 was available and that he (Adame) would be at the car lot in twenty minutes. Zavala, Garcia-Esparza, Valles, and an additional crew of thirteen or fourteen TMM members then proceeded to the car lot, where Adame gave Zavala the $30,000.00 and requested his motorcycle and truck back. Instead of returning the vehicles as promised, though, Zavala kept them as additional payment for back taxes.

Four weeks after the second incident, Adame told Zavala during a telephone conversation that he was quitting the TMM. Approximately two or three weeks after that, Adame received a telephone call from Jesse Hernandez, a close friend of his and a TMM member. During this telephone conversation, Hernandez told Adame that Zavala had given Valles a "green light" on him, meaning that Zavala had ordered Valles to murder him. After this conversation, Adame became very cautious, even moving to a new home.

In early September, as Adame was approaching the door to his home, he heard a vehicle come to an abrupt stop behind him and, after turning around, saw Valles jump out of a van and start shooting at him, with a gun in each hand. Adame ran and called the police on his cellular phone, telling them that he had been shot several times and requesting help. In fact, he had been

19

shot three times.

After the police arrived, Adame lost consciousness and was taken to the hospital, where he remained for approximately a month and a half. Because of his wounds, Adame was relegated to a wheelchair and had to use a colostomy bag for approximately one year.

On cross-examination, Garcia-Esparza's counsel questioned Adame about his father. Adame testified that his father was killed by the TMM. At this point, defense counsel asked Adame why he had joined the TMM if it was responsible for his father's murder. Adame explained that he joined because he did not want to be killed himself. Defense counsel then proceeded to question Adame about why he had quit the TMM, to which Adame answered that he did so after the TMM began taking his possessions. Defense counsel then posed the following question: "You didn't get fed up when they started shooting your family, killing your father. It wasn't until they started taking your stuff that you decided to quit, you were fed up with this?" Adame explained that he had not really known his father, who had been in prison most of Adame's life. Defense counsel then interrupted Adame, leading to the following dialogue:

> Q: You know, it is surprising how much trouble you had talking earlier --

A:    In June --

Q:    -- this morning but you can't shut up now.  Wait
      till I ask you a question.  Now was that all some
      big act earlier that you came out here with that
      production you made that you couldn't talk?

A:    Do you want to see my wounds?

Q:    Did you hear what I asked you?

A:    No, it wasn't a big act.

Q:    You were not wounded in a courtroom were you?

A:    No.

Q:    You weren't wounded when you were surrounded by
      U.S. Marshals, were you?

A:    I was scared.  I started getting anxiety attacks.

Q:    You weren't wounded by people on this jury, were
      you?

A:    No.

Q:    But yet you made that big production out here this
      morning that you couldn't talk because these
      people scared you?

A:    No, because [the defendants] scared me.

The government began re-direct by asking Adame: "Just to make sure you didn't make up this whole shooting thing, will you stand up and show us your scars?"  Defense counsel objected, and the district court sustained the objection.

On re-cross, Valles's counsel, who had just obtained the police report for the September 2003 shooting incident, began the

21

following exchange:

Q: Do you remember talking to an Officer P. Joke [phonetic], Badge No. 950, about this case?

A: At the scene?

Q: Yes.

A: Yes.

Q: Do you remember telling him —— and here the complainant is you. Do you remember telling him that you, Luis Adame: "Said he didn't know any of the people that got out of that van shooting at him"? Do you remember saying that, yes or no?

A: The reason I said that is because ——

Q: Yes or no?

A: I wanted to get them myself.

Q: Yes or no?

A: I wanted him myself.

THE COURT: Wait, wait.

A: This is what he did to me.

THE COURT: Wait. Sit down.

A: He shot me.

THE COURT: Get him out of here. Out, out, out.

MARSHALL: Step this way, please.

THE COURT: I don't have time for nonsense. Out. And I'm going to tell the prosecution don't ever bring someone who's just going to show a lot of nonsense. Next witness.

22

[VALLES' COUNSEL]:  May his testimony be --

THE COURT:      It's all struck.  Let's go.

[VALLES' COUNSEL]:  Motion to disregard.

THE COURT:      Motion to disregard.  Just pretend the gentleman was never there.

[THE GOVERNMENT]:   Dr. Kim Molina, Your Honor.

[VALLES' COUNSEL]:  I'm sorry, Your Honor.  I need to make a motion for mistrial.

THE COURT:      I understand.  That's denied.  Thank you.  The motion is made as to each defendant and it's denied as to each defendant.

During this exchange, Adame had stood and shown the jury the scars from his gun-shot wounds.  It was at this point that the court told Adame to sit down, then had him removed from the courtroom, striking the entirety of his testimony.

As part of its jury charge, the district court instructed:

During the trial I sustained objections to certain questions.  You must disregard those questions entirely.  Do not speculate as to what the witness would have said if permitted to answer the question.  As I told you during the trial, I also struck the entire testimony of Luis Adame, and you are instructed to disregard his testimony in its entirety.  You shall not consider any part of his testimony for any reason whatsoever.  Your verdict must be solely based on the legally admissible evidence and testimony.

On appeal, the defendants contend that Adame's revealing of his scars necessitates a mistrial, because his actions were

23

unfairly prejudicial and incurable.[5]

### 1. Standard of Review

We review the denial of a motion for mistrial for abuse of discretion.[6]  A new trial is required only when, after a review of the entire record, it appears that there is a significant possibility that the prejudicial evidence had a substantial impact on the jury verdict.[7]  We give great weight to the trial court's assessment of the prejudicial effect of the evidence, and

---

[5] The defendants also assert, albeit somewhat cryptically, that the government knowingly presented false testimony and thus a mistrial must be granted.  The defendants apparently contend that Adame's prior inconsistent statement to the police — that he did not know any of the people who shot him — rendered his testimony false and, more importantly, this was known by the government when it elicited Adame's testimony.  We disagree.

There is absolutely no evidence that the government intentionally presented testimony known to be false.  The government presented Adame's testimony surrounding the who, how, and why of his shooting.  Defense counsel was able effectively to cross-examine Adame on his prior inconsistent statement regarding the identity of his shooter.  Adame responded that he gave an intentionally false statement to police and was now giving truthful testimony.  The government did not ask Adame whether he made a statement to the police or the substance of such a statement, thereby allowing Adame to deny the existence or substance of the statement.  Instead, the prosecution asked fact questions (e.g., who shot you and how did it happen?), which was subjected to cross-examination.  In fact, at the time of its direct examination of Adame, the government did not have the police report and had never even seen it before.  Thus, it is unclear how, on this basis, the government knowingly and intentionally elicited false testimony.

[6] United States v. Dupre, 117 F.3d 810, 823 (5th Cir. 1997).

[7] United States v. Paul, 142 F.3d 836, 844 (5th Cir. 1998).

24

prejudice may be rendered harmless by a curative instruction.[8] We also examine the context of the challenged statement to determine whether the prejudicial comment was elicited by the government or was a spontaneous act by the witness.[9]

2.    Merits

Our review of the record on appeal satisfies us that the district court did not abuse its discretion in denying the defendants' motions for mistrial. Adame's showing of his scars was not so prejudicial that it could not be cured with instructions to the jury. He had already testified, without objection, that he had been shot by Valles, had been hospitalized, and had suffered severe injuries. His shooting, hospitalization, and injuries were not in dispute; only the identities of the responsible parties were in dispute. Revealing his scars may well have been unwarranted drama, but his actions did not present new, inadmissible evidence. It only tended to confirm what was already known —— that Adame had been shot.

In addition, his actions were not elicited by the government. First, during cross-examination, Adame asked Garcia-Esparza's counsel if he wanted to see Adame's scars. True, the

---

[8] United States v. Nguyen, 28 F.3d 477, 483 (5th Cir. 1994).

[9] United States v. Moreno, 185 F.3d 465, 472-73 (5th Cir. 1999).

25

government on re-direct examination had asked Adame to show the jury his scars, the district court quickly sustained the defense's objection and prevented Adame from doing so. It was only during defense counsel's re-cross examination that Adame autonomously revealed his scars. He did so when defense counsel questioned him about the shooting and suggested that he did not know who shot him. This occurred after an intense cross-examination, during which Adame was questioned about his father's murder and was made to appear that he valued his possessions more than his family. Given the timing and context of Adame's actions and the fact that he was the first to bring up the possibility of revealing his scars, we cannot conclude that the government elicited Adame's actions.

More importantly, after Adame revealed his scars, the district court quickly and authoritatively took command of the situation, expelling Adame from the courtroom, striking his entire testimony, and admonishing the prosecution. During the jury charge, the district court again instructed the jury that it could not consider any of Adame's testimony. Based on the limited prejudice suffered by the revealing of Adame's scars and the strong, immediate actions of the district court, we conclude that the district court did not abuse its discretion in denying the defendants' motions for mistrial.

C.   Garcia-Esparza's Claim of Ineffective Assistance of Counsel

Garcia-Esparza contends that his trial counsel failed to provide effective assistance of counsel because (1) he failed to move for a mistrial after Adame's testimony, and (2) he failed to argue effectively against the district court's decision to sentence Garcia-Esparza to 720 months, as recommended in his Pre-Sentence Investigation Report ("PSR").

1.   Standard of Review

To prevail on an ineffective assistance of counsel claim, a defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance was prejudicial.[10] To satisfy the first prong, the defendant must demonstrate that the alleged errors were so serious that the assistance was below the constitutional minimum guaranteed by the Sixth Amendment, as measured under an objective standard of reasonableness.[11]   To satisfy the second prong, the defendant must show that his counsel's performance prejudiced him to such an extent that the trial or sentencing was fundamentally unfair or unreliable and that, but for counsel's errors, the result would have been different.[12]

---

[10] Strickland v. Washington, 466 U.S. 668, 687 (1984).

[11] United States v. Faubion, 19 F.3d 222, 228 (5th Cir. 1994).

[12] Id.

27

Our review is highly deferential to counsel and presumes that counsel's assistance was adequate.[13]  Moreover, we will not resolve a claim of ineffective assistance of counsel on direct appeal when the defendant fails to raise the issue in the district court, except when a well developed record exists.[14]

2.    Merits

Our review of the record convinces us that the performance of Garcia-Esparza's trial counsel was not deficient.  As to Adame's testimony, immediately after Valles' counsel orally moved for a mistrial, the district court considered the mistrial motion as having been made by each defendant and then denied it as to each defendant.  It would have been redundant and pointless —— and not conceivably a constitutional violation —— for Garcia-Esparza's trial counsel to move personally for a mistrial.

As for sentencing, it is entirely unclear what Garcia-Esparza contends was deficient.  In his appellate brief, the totality of his argument consists of the following: "Appellant's counsel failed to argue effectively the judge's adherence to the PSR.  The PSR called for 720 months instead of the range above noted, 352 to 425 months."  This claim simply lacks the requisite

---

[13] Burger v. Kemp, 483 U.S. 776, 789 (1987).

[14] United States v. Brewster, 137 F.3d 853, 859 (5th Cir. 1998).

specificity needed for appellate review, as it is unknown what Garcia-Esparza claims to be error.

The most that we can decipher is that Garcia-Esparza takes issue with the district court's factual finding that he was responsible for the distribution of over 150 kilograms of heroin and 30 kilograms of cocaine. To the extent that this is Garcia-Esparza's argument, we note that his trial counsel objected in-depth to the factual findings in the PSR, both to the probation officer —— who relayed the objections to the district court prior to the sentencing hearing —— and to the district court during the sentencing hearing. One of his objections asserted that the PSR incorrectly calculated the Guidelines range, claiming that it should have been 352 to 425 months, because the district court incorrectly found that Garcia-Esparza was responsible for the distribution of over 150 kilograms of heroin and 30 kilograms of cocaine, rather than the 1.6 kilograms of heroin and 2.3 kilograms of cocaine advocated by Garcia-Esparza. The district court considered Garcia-Esparza's objections prior to the sentencing hearing, afforded trial counsel an opportunity to argue the objections orally at the sentencing hearing, and then denied the objections. We cannot see how the actions of Garcia-Esparza's trial counsel were deficient in any way.

If perchance this is not Garcia-Esparza's argument of

29

ineffective assistance at sentencing, we rule that his argument was waived for inadequate briefing.[15]

D.   Valles' Due-Process Claim

Valles contends that the district court violated his constitutional right to due process by not allowing him to enter his plea in front of the jury.  Valles acknowledges that "he can find no case supporting this proposition," but insists that he has a constitutional right to plead before the jury.

1.   Standard of Review

The identification of a liberty interest that is protected by the Due Process Clause is a question of federal constitutional law and reviewed de novo.[16]  As Valles failed to raise this issue before the district court, we review his claim for plain error.[17] Under plain error review, we may exercise our discretion to reverse a defendant's conviction if there is (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings.[18]  An error is "plain" if it is clear

---

[15] Int'l Truck & Engine Corp. v. Bray, 380 F.3d 231, 232 (5th Cir. 2004).

[16] Madison v. Parker, 104 F.3d 765, 767 (5th Cir. 1997).

[17] United States v. Vargas-Garcia, 434 F.3d 345, 47 (5th Cir. 2005).

[18] United States v. Lewis, 412 F.3d 614, 616 (5th Cir. 2005).

under current law.[19]

### 2. Merits

As Valles recognizes, there is no authority for the legal holding that due process entitles a defendant to enter a plea in front of a jury. Thus, even assuming without granting that Valles had a constitutional right to enter his plea before the jury, this right is not clear under current law and thus cannot constitute plain error. Valles' claim therefore fails.

### E. Zavala's Sentencing Challenge

Zavala asserts that the district court impermissibly found for sentencing purposes that he was responsible for the murder of Jose Luis Moreno. At the conclusion of trial, the jury was asked if it found beyond a reasonable doubt that Zavala had intentionally or knowingly killed Moreno. The jury answered in the negative.

Notwithstanding the jury verdict, Zavala's PSR concluded that the information relevant to the murder of Moreno was sufficiently reliable to support a finding that "it was reasonably foreseeable that Zavala was responsible for [Moreno's murder] and should be held accountable for [this act]." Prior to sentencing, Zavala objected to the PSR's recommendation on this

---

[19] United States v. Olano, 507 U.S. 725, 734 (1993).

31

point.  At sentencing, the district court overruled Zavala's objection, found that he was responsible for Moreno's murder, and sentenced him accordingly.

On appeal, Zavala contends that United States v. Booker[20] prevents the district court from sentencing a defendant on facts not found by a jury or admitted in a guilty plea.  Thus, Zavala insists, the district court committed reversible error by sentencing him based on facts of which he was acquitted by a jury.  Zavala argues, in the alternative, that there was insufficient evidence to support the district court's finding, regardless of the standard, i.e., beyond a reasonable doubt or by a preponderance of the evidence.

1.  Standard of Review

We review a district court's interpretation and application of the Guidelines de novo and its factual findings in connection with sentencing for clear error.[21]  We will find a district court's factual findings to be clearly erroneous only if, based on the entirety of evidence, we are left with the definite and firm conviction that a mistake has been made.[22]  A factual finding is not clearly erroneous if it is plausible in light of

---

[20] 543 U.S. 220 (2005).

[21] United States v. Parker, 133 F.3d 322, 328 (5th Cir. 1998).

[22] United States v. Valdez, 453 F.3d 252, 262 (5th Cir. 2006).

32

the entire record.[23]

In making its factual findings for sentencing, a district court may adopt the findings of the PSR without additional inquiry if those facts have an evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information is materially unreliable.[24] The defendant has the burden of showing that the information relied on by the district court in the PSR is materially unreliable.[25]

2. Merits

Post-Booker, a district court may sentence a defendant on facts not established by either a guilty plea or jury verdict, as long as the conduct for which the defendant was acquitted has been proven by a preponderance of the evidence.[26] Thus, Valles' argument that the district court's fact finding was a per se Booker violation is foreclosed. Accordingly, the real issue on appeal is whether the district court's finding by a preponderance of the evidence that Zavala murdered Moreno was clearly erroneous.

---

[23] Id.

[24] Id.

[25] Id.

[26] Id. at 264.

33

At trial, Bexar County Deputy Sheriff Sal Marin testified about the investigation of Moreno's death. According to Marin, Moreno was reported missing and an investigation into his whereabouts was commenced in July 2002. During the course of the investigation, law enforcement officers learned that Moreno was a TMM member and had rented a Sports Utility Vehicle ("SUV") on July 3, 2002. It was found burned on July 11, 2002. On October 15, 2003, skeletal human remains eventually identified as Moreno's were found on the property of Tomas Carrasco, who is the father of TMM member Ray Carrasco. Based on his experience with the TMM, Marin testified that the TMM usually disposes of homicide victims by burying the remains in rural areas and that the burial of Moreno's body fit this pattern.

In addition, TMM member Joe Rene Tamayo testified that, one morning in mid-July 2002, he got a telephone call from TMM member Casper around 2:30 a.m. Casper told Tamayo that they needed to do a "cook out," which was TMM code for a procedure the TMM used to dispose of evidence, such as a weapon or vehicle, by burning it. According to TMM custom, the TMM member who used the weapon at issue would present it to Tamayo, who would then destroy it by burning it with a blow torch. To effectuate this cook out, Casper and Tamayo arranged to meet that morning at a place in the West side of San Antonio where they frequently performed cook

34

outs.  After Tamayo arrived at the cook out, Zavala, who was not a TMM member at the time, showed up, looking shaken and scared, and gave a gun to Tamayo.

After torching the gun, Casper told Tamayo that they also needed to dispose of a vehicle.  Casper and Tamayo went to a gas station and filled two gas cans with gasoline.  Casper then had Tamayo pick up the vehicle, which was a Jeep Cherokee SUV.  Tamayo knew the vehicle belonged to Moreno, because he recognized it as Moreno's and also saw receipts in the vehicle belonging to Moreno.  Tamayo drove Moreno's SUV towards Castroville, Texas, parked it on the side of the road, and burned it.  Tamayo further testified that he saw bloody hand prints sliding down the rear windshield of the automobile.  Tamayo never saw Moreno again.

Tamayo also testified that, prior to the murder, Zavala had been associating with TMM members and wanted to become one.  The day before the cook out, Zavala had talked to Tamayo, indicating that he did not trust Moreno, that Moreno was doing drugs, and that Moreno was probably an informant.  Shortly after the cook out was performed, Zavala became a member of the TMM and was given Moreno's former position as lieutenant of the North corner.

Additional testimony indicated that it was rare for a person who had not been in prison to be admitted to the TMM and that, to make up for this, a non-convict prospecto — such as Zavala —

35

would often be required to commit a "cameo," which meant killing someone on the TMM's behalf.

Given that (1) Moreno's remains were found on the property of a TMM member's father, (2) the remains were buried in a rural area, as customary with the TMM, (3) Moreno's automobile was found torched, (4) Tamayo admitted torching Moreno's automobile on the same night that he received a gun from Zavala for a "cook out," (5) TMM custom had the user of the gun present it to Tamayo for torching, (6) there were bloody hand prints on the rear windshield of Moreno's SUV, (7) Zavala suspected Moreno of being an informant, (8) Zavala became a TMM member, taking Moreno's position after his death, (9) Zavala wanted to become a TMM member prior to Moreno's death, and (10) TMM custom required a non-convict prospecto to murder a person on behalf of the TMM before being admitted into the TMM, the district court did not commit clear error in finding by a preponderance of the evidence that Zavala killed Moreno.

F.  Garcia-Esparza's Sentencing Challenge

Garcia-Esparza asserts that the district court sentenced him in violation of Blakely v. Washington[27] and Apprendi v. New Jersey.[28]  He contends that the district court erred by

---

[27] 542 U.S. 296 (2004).

[28] 530 U.S. 466 (2000).

36

increasing his sentence based on judge-found facts, despite failing to identify which facts are in contention. Regardless of which facts are in contention, Garcia-Esparza's claim is without merit. A district court may sentence a defendant on the basis of judge-found facts post-Booker.

G.    Garcia's Sentencing Challenge

Garcia insists that the district court committed error in purporting to find by a preponderance of the evidence that Garcia was a leader or organizer of the Count One conspiracy. At the conclusion of trial, the jury was asked if it found beyond a reasonable doubt that Garcia was a leader or organizer of the overarching conspiracy alleged in Count One of the Indictment. The jury answered in the negative.

Notwithstanding the jury verdict, Garcia's PSR recommended that the district court find that Garcia was an organizer or leader of the conspiracy and enhance his Guidelines range accordingly. Garcia objected to the PSR, but the district court denied the objection and found by a preponderance of the evidence that Garcia was an organizer or leader of the conspiracy.

On appeal, Garcia claims that his sentence violated Booker and Blakely because the district court sentenced him based on facts of which he was acquitted by the jury. As previously noted, this claim is without merit and thus fails.

H.  Valles's Sentencing Challenge

Valles contends that the district court violated <u>Booker</u> in finding that Valles distributed and possessed with the intent to distribute a specified quantity of drugs and that he was a leader or organizer of the Count One conspiracy.  The jury was not asked to find beyond a reasonable doubt the amount of drugs that Valles was responsible for or whether Valles was a leader or organizer of the conspiracy.  Nonetheless, the district court enhanced Valles' sentence based on the drug quantity and on his status as a leader or organizer.  On appeal, Valles contends that the district court's actions violated <u>Booker</u> and <u>Blakely</u>.  Once again, as noted above, this claim is without merit and thus fails.

## III.  CONCLUSION

Based on the applicable law and our extensive review of the parties' briefs and the record on appeal, we hold that the district court did not commit any error.  We therefore affirm the defendants' convictions and sentences.

AFFIRMED